Marshall **NERO**, Barbara Nero, Vicki Mitchell, and Murray Mitchell, Plaintiffs,

v.

The **HOSPITAL AUTHORITY OF WILKES COUNTY**, d/b/a Wills Memorial Hospital; Wilkes County Georgia; James L. Jarrett, in his official and individual capacities; George Grimaud, Jr., in his official and individual capacities; Gerald Norman, in his official and individual capacities; Jeana Randall, in her official and individual capacities; Arnold Adams, in his official and individual capacities; Tommy Bradford, in his official and individual capacities; Joe A. Griffin,

in his official and individual capacities; Henry Gartrell, in his official and individual capacities; M.R. Clayton, DVM, in his official and individual capacities; Dr. Charles Eugene Pollock, in his official and individual capacities; Quorum, Inc.; Dr. Charles E. Wills, Jr.; Dr. Beeki N. Kuppuswamy; Dr. David T. Kirk; Robert J. Williams; Dr. Stanley P. Coe; Dr. Elizabeth A. Coe; and J.W. Thornton, Defendants.

No. CV 196–218.

United States District Court,
S.D. Georgia,
Augusta Division.

Dec. 16, 1998.

well as state claims for intentional interference with employment relations and defamation. The Defendants filed counterclaims against Plaintiff Marshall Nero for breach of settlement agreement. Upon careful consideration of the arguments presented to the Court, the briefs, and the relevant law, it is hereby **ORDERED** that the Defendants' motions are **GRANTED** as to the federal claims, and the remaining state law claims and counterclaims are **REMANDED** to the Superior Court of Wilkes County.

## I. BACKGROUND

This case arises out of events that took place at Wills Memorial Hospital (Hospital) in late 1995 and 1996. During this time the Plaintiffs contend that the Defendants engaged in a conspiracy to terminate their employment. The Plaintiffs are two married couples who were administrators of the Hospital. Marshall Nero was the Hospital Administrator from 1989 until March 1996. Mr. Nero's spouse, Barbara Nero, worked at the Hospital from 1991 until October 1996 and was the Laboratory Manager for the Hospital from 1995 until October 1996. Murray Mitchell was the Hospital's Chief Financial Officer (CFO) from 1992 until October 1996. Mr. Mitchell's spouse, Vicki Mitchell, was the Director of Nursing from 1992 until June 1996.

Plaintiffs' allegation of a vast conspiracy has resulted in some twenty defendants. Plaintiffs' suit alleges a conspiracy involving the following: seven members of the Hospital's Medical Staff,[2] the Wilkes County Hospital Authority and its individual members,[3] Wilkes County, two individual

## ORDER

BOWEN, Chief Judge.

Before the Court in the above-captioned matter are four separate motions for summary judgment filed by the various Defendants in this case.[1] This case is brought by four Plaintiffs alleging federal claims pursuant to 42 U.S.C. § 1983 for First Amendment retaliation. Plaintiffs also bring one claim pursuant to the Fair Labor Standards Act (FLSA), 29 U.S.C. §§ 201 *et seq.*, for uncompensated work as

1. The numerous Defendants are represented by counsel in four groups and bring their motions for summary judgment separately.

2. The Physician Defendants are Dr. Charles Eugene Pollock, Dr. Charles E. Wills, Jr., Dr. Beeki N. Kuppuswamy, Dr. David T. Kirk, Dr. Robert J. Williams, Dr. Stanley P. Coe, and Dr. Elizabeth A. Coe.

3. The members of the Hospital Authority are George Grimaud, Gerald Norman, Jeana

Randall, Arnold Adams, Tommy Bradford, Joe Griffin, Henry Gartrell, M.R. Clayton, J.W. Thornton, and Dr. Charles Eugene Pollock. Dr. Charles Eugene Pollock's brother, Dr. Ed Pollock, died on February 9, 1996. At the time of his death, he was a member of the Hospital Authority. Dr. Eugene Pollock was asked to succeed his deceased brother as a member of the Authority. Thus, at the time of the February 27, 1996 letter, Dr. Eugene Pollock was a member of the Authority although he did not sign the letter in that capacity.

members of the Wilkes County Board of Commissioners, Quorum, Inc., and Quorum's employee, James Jarrett.

## A. FEBRUARY 27, 1996 LETTER

The central event in this lawsuit occurred on February 27, 1996, when seven members of Hospital's Medical Staff (Physician Defendants) met and signed a letter to Defendant Wilkes County Hospital Authority (the Authority) requesting the resignations of the four Plaintiffs. The letter was presented to the Authority on February 28, 1996. In pertinent part, the letter states that "[w]e the primary care practitioners of the medical staff, recognise [sic] a state of division and adversity in the hospital that cannot continue. It has developed over a period of time ... result[ing] in a loss of autonomy of the medical staff and a loss of our confidence in this administration." (Defendant Authority's Ex. 7). Plaintiffs contend that the Physician Defendants threatened to boycott the Hospital if the Authority did not obtain the Plaintiffs' resignations.

This "state of division" resulted from actions taken by the Plaintiffs which they characterize as the exercise of protected speech. Plaintiffs contend that they engaged in protected speech when they spoke on matters involving sexual harassment complaints, financial matters, and the manner in which the Physician Defendants handled patient care and the "peer review" process. These events occurring prior to the Physicians' Letter are detailed below.

### 1. Plaintiff Marshall Nero's Actions

In April 1995, while Plaintiff Marshall Nero was Hospital Administrator, the Georgia Department of Human Resources (DHR) found numerous deficiencies in the "peer review" process. This "peer review" process, which is also referred to as quality improvement, is a process where physicians review the charts of other physicians in an effort to identify problems in patient care. The DHR found that the Medical Staff's implementation of the process was substandard. This deficiency and others threatened the Hospital's participation in the Medicare and Medicaid programs.

"In response to DHR's concerns, Marshall Nero convinced the Authority to bring in an outside consultant to work with the medical staff to correct its deficient peer review process." (Plaintiffs' Resp. to Authority's Mot. at 5). After the consultant, Dr. Backstrom, performed his review, Marshall Nero sent a memorandum to the Chief of Staff, Defendant Dr. Wills, on November 7, 1995. In this memorandum from the Administrator to the Chief of Staff, Marshall Nero wrote:

> In April 1995, the Georgia Department of Health and Human Services came very close to taking away this hospital's license to operate, and also at the same time, decertifying Wills Memorial for Medicare and Medicaid. This was primarily due to the Medical Staff's refusal to institute effective Quality Improvement.

> The hospital has gone to a great expense to put a Quality Improvement Plan in place and also to secure a consultant to help the Medical Staff implement this Plan.... We must understand that the State will return after the first of the year to evaluate the progress of the Hospital and the Medical staff has made in our Quality Improvement process.

> As of today, the Medical Staff *would fail miserably.* The Staff appears to have *gone out of its way to sand-bag the process.*

(Marshall Nero Aff. Exhibit 18) (emphasis added).

In response to this letter, one of the Physician Defendants, Dr. Williams, wrote Marshall Nero on January 25, 1996, and said that "[i]t has taken me this long to review, calm down, and write a very sensible, level headed, unbiased opinion of your statement." (Plaintiffs' Ex. 17). Further, the letter stated that "it seems that [the November 1, 1995 memorandum] was a little harsh in the way you stated these accusations, as a matter of fact, all of the medical staff, including myself, were high-

ly insulted by such a low demeaning slanderous letter." (*Id.*) Dr. Williams's letter is clear evidence of the "state of division" between the Administration and the Medical Staff.

Marshall Nero also contends that he spoke to the Authority about two separate financial improprieties involving members of the Medical Staff. The first situation involved Defendants Drs. Stan Coe and Williams and a contract between the Hospital and Coastal Emergency Services (Coastal). Coastal provided emergency room physicians to staff the Hospital's emergency room. Drs. Stan Coe and Williams worked for Coastal and helped staff the emergency room. While working in the emergency room, however, the two doctors would also allegedly deliver their private patients' babies and receive double payments for their time.

The second situation also involved Dr. Williams. Marshall Nero believed that a $3,500 per month payment to Dr. Williams from the Authority to perform quality assurance review was "fraud and abuse" because Dr. Backstrom was already being paid to perform that task. Plaintiffs Marshall Nero and Murray Mitchell raised this concern with the Authority and the payments to Dr. Williams were stopped.

### 2. *Plaintiff Vicki Mitchell's Actions*

Plaintiff Vicki Mitchell alleges that she engaged in protected speech when she reported allegations of sexual harassment and when the Physician Defendants perceived her as someone who had reported deficiencies in patient care. Around the time of Marshall Nero's November memorandum, several nurses had made accusations that Defendant Dr. Williams was sexually harassing them. Plaintiff Vicki Mitchell, the Director of Nursing, told the Authority about these accusations.[4] Subsequently, the Authority conducted an investigation into the matter. The Physician Defendants perceived that Vicki Mitchell

had attempted to "fabricate false allegations" against Dr. Williams. (Kuppaswamy's Deposition at 200–01).

Plaintiffs contend that Vicki Mitchell engaged in protected speech when the Defendants perceived her as the person who reported a patient's death to the State Composite Board of Medical Examiners. Less than one month prior to the February 27, 1996 letter, the State Composite Board of Medical Examiners issued a public reprimand to Defendant Dr. Wills for the death of a patient in 1992. The patient died from a fatal overdose of medication. The death was reported to the Nursing Board at Dr. Wills's request. He believed that the nurse who gave the medication to the patient was the cause of the error. The Nursing Board turned the investigation over to the State Composite Board of Medical Examiners who eventually issued the reprimand. Although Vicki Mitchell did not report Dr. Wills, the Plaintiffs contend that the Physician Defendants *perceived* that she was involved and blame the Plaintiffs for Vicki Mitchell's "perceived role" in the reprimand.

### B. *MARSHALL NERO'S RESIGNATION*

Following the February 28, 1996 presentation of the letter to the Authority, the Authority met with Marshall Nero and encouraged him to work out the differences between the Administration and the Medical Staff. Subsequently, Marshall Nero wrote a letter to each Physician Defendant requesting a meeting. The Physician Defendants refused to meet with him individually, but offered to meet with him as a group. Marshall Nero met with the Physician Defendants and the Authority on March 20, 1996. After the meeting, the Authority contends that it became apparent that the differences could not be resolved, and thus, the Authority asked Mar-

---

**4.** "Mitchell, as the supervisor of Williams' victims, brought the matter to the Board's attention." (Plaintiffs' Brief at 17).

shall Nero to propose a severance package for his resignation.

Marshall Nero resigned on March 27, 1996. In exchange for his resignation and a release, the Authority paid Marshall Nero the sum of $60,000. The release discharged the Hospital, its employees, and its agents from any claims arising out of his employment with the Hospital.

### 1. Marshall Nero's Actions After the Physicians' Letter

Marshall Nero sent an unsigned letter dated March 11, 1996, to a Medicaid fraud investigator in Atlanta, Georgia. In the letter, Marshall Nero accused Drs. Williams and Wills of defrauding Medicaid. Specifically, Nero contended that Dr. Williams was billing Medicaid for cesarean sections that were actually performed by Dr. Wills, a non-Medicaid provider.

On March 15, 1996, Marshall Nero sent a letter to the State Composite Board of Medical Examiners and requested that the February reprimand of Dr. Wills be sent to the local newspaper for publication. Also, sometime in late March, Marshall Nero sent an unsigned letter to the State Composite Board of Medical Examiners complaining about alleged incompetence and illegal drug use by Defendant Dr. Eugene Pollock.

### 2. Barbara Nero and Vicki Mitchell's Actions After the Physician's Letter

In March 1996, Marshall Nero's wife, Barbara Nero, made numerous reports to various governmental agencies alleging wrongdoing at the Hospital. Shortly after the Physicians' Letter was presented, she called the State Attorney General's office and the Georgia Bureau of Investigations and alleged illegal activities were occurring at the Hospital. On March 21, 1996, she sent a letter to the State Composite Board of Medical Examiners alleging serious illegal activities and incidents of malpractice by several of the Physician Defendants dating back to 1994. All of the alleged incidents of wrongdoing, however, predated the Physicians' Letter. Moreover, Barbara Nero reported the same cases of alleged malpractice to the DHR in April 1996. Last, Barbara Nero wrote the Federal Trade Commission alleging antitrust violations by the Physician Defendants for their alleged threat to boycott the Hospital.

After the February 27, 1996 letter, Vicki Mitchell renewed her allegation that Dr. Williams sexually harassed several of her nurses. Other than the sexual harassment allegations, Vicki Mitchell testified that she never contacted DHR or any other agency about problems at the Hospital and that she only provided requested information and records to DHR during its investigations.

### C. QUORUM (NEW ADMINISTRATION)

After Marshall Nero's resignation, a succession of interim administrators took his place. Tommy Bradford, a member of the Authority, initially took over as interim administrator. In early April 1996, the Authority contracted with Quorum, Inc., a hospital management company, to manage the Hospital. Quorum appointed Louis Bremer as interim administrator on April 22, 1996, and he served until June 17, 1996. Bremer was replaced by James Jarrett. Jarrett served as interim administrator until the permanent administrator, Vincent DiFranco, was selected.

When Quorum began managing the Hospital, the Hospital was in danger of losing its Medicare certification. Following an inspection, the DHR issued a "23–day fast track termination notice," which gave the Hospital twenty-three days to institute a plan to correct deficiencies or lose certification. Some of the deficiencies involved the "peer review" process and Medical Staff privileges. The Defendants contend that an adversarial relationship developed between Quorum and the Medical Staff because of changes Quorum instituted.

In addition to the Medicaid problems, Quorum discovered that the Hospital was experiencing severe financial difficulties.

Quorum Associate Vice–President, Chris Johns, surveyed the financial condition, and he projected a one million-dollar shortfall. Johns found that much of the shortfall was from a backlog in accounts receivable. Because of the financial problems, Quorum contends it requested that the Authority terminate Plaintiff Murray Mitchell. The Authority, however, contends that it decided that Murray Mitchell should not be terminated, but counseled and given a second chance. Several memoranda were sent to Murray Mitchell outlining his deficiencies and requesting that he correct these problems. Plaintiffs characterize these letters as written reprimands.

### D. *THE DEPARTURES OF THE OTHER PLAINTIFFS*

Even after Quorum took over management of the Hospital, Plaintiffs Vicki Mitchell, Murray Mitchell, and Barbara Nero contend that the Physician Defendants still wanted them fired. These Plaintiffs contend that the Physician Defendants achieved their goal when all were eventually fired. Defendants contend otherwise.

Vicki Mitchell contends that she met with interim administrator James Jarrett during the first week of his tenure on June 21, 1996. She states that she only told Jarrett that she knew that the Defendants were still trying to get her fired and "she wants to do what's right for the hospital, even if it meant eventually not being Director of Nursing." (Plaintiffs' Brief at 25). On the other hand, Defendants contend that she offered to resign at this meeting, and the Hospital accepted her resignation later that same day. Regardless, Vicki Mitchell admits that she told the local newspaper that she had resigned and that she stated in writing on three separate job applications that she had resigned her employment with the Hospital.

Plaintiff Murray Mitchell continued to serve as CFO until October 1996. Murray Mitchell contends that he was constructively discharged from his position and was forced to accept other employment. He states that he saw "the writing on the wall" and began to seek another position. In October 1996, Murray Mitchell secured a job in Baxley, Georgia. This job paid him $5,000 more annually than his position with the Hospital. On October 8, 1996, Murray Mitchell gave two weeks notice of his departure. When the local newspaper contacted him about his resignation, he stated "My leaving is entirely voluntary." (Murray Mitchell's Deposition, Exhibit 9).

Finally, Barbara Nero contends she was terminated on October 25, 1996. Defendants, however, contend that she was laid off as part of a reduction in force. Barbara Nero's employment was terminated along with numerous other employees and four other department heads. Defendants contend that this was necessary to keep the Hospital open in light of its troubling financial condition. Barbara Nero argues that the Physician Defendants pressured Quorum into terminating her and notes that her name was not added to the list of those to be laid off until the day of the actual layoff. Barbara Nero contends that she was laid off despite being changed from an hourly employee to a salaried employee and complimented by management the day before.

### 1. *Lab Manuals*

After being laid off, Barbara Nero removed several lab manuals that she compiled while employed by the Hospital. After removing the manuals, Barbara Nero wrote a letter to DHR and reported that the Hospital did not have the required lab manuals. Barbara Nero returned the manuals after the Hospital filed suit against her in the Superior Court of Wilkes County for the return of the manuals. Barbara Nero now claims that she is entitled to overtime compensation for the manuals because she contends that she compiled them at home on her own time.

### E. *MOTIONS*

Plaintiffs filed this lawsuit on December 23, 1996. The Hospital, the Authority, and

the members of the Authority individually filed a counterclaim against Marshall Nero on April 15, 1997 alleging that he violated his settlement and release. Marshall Nero filed a Motion for Sanctions on February 19, 1998, alleging that the counterclaim was frivolous. The Authority Defendants filed a Motion for Partial Summary Judgment as to the sanctions on March 6, 1998. The Court terminated the Motion for Sanctions and ordered the parties to urge the motion at a later time, if appropriate. The four groups of Defendants filed four separate motions for summary judgment as to all claims. A hearing on these motions was held on September 30, 1998.

## II. SUMMARY JUDGMENT STANDARD

The Court should grant summary judgment only if "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Applicable substantive law determines which facts are material, that is, which facts have the potential to affect the outcome of the trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The Court must "resolve all reasonable doubts about the facts in favor of the non-movant, and draw all justifiable inferences in his [or her] favor." *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir.1991) (en banc) (internal quotation marks and citations omitted).

The moving party has the initial burden of showing the Court, by reference to materials on file, the basis for the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). However, the nature of the movant's initial burden "varies depending on whether the legal issues, as to which the facts in question pertain, are ones on which the movant or the non-movant would bear the burden of proof at trial." *Fitzpatrick v. City of*

*Atlanta*, 2 F.3d 1112, 1115 (11th Cir.1993). If the *movant* bears the burden of proof at trial, that party "must show that, on all the essential elements of its case, . . . no reasonable jury could find for the non-moving party." *Four Parcels*, 941 F.2d at 1438. On the other hand, if the *non-movant* has the burden of proof at trial, the movant may carry the initial burden either by negating an essential element of the non-movant's case or by demonstrating that there is an absence of evidence to prove a fact necessary to the non-movant's case. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 606–08 (11th Cir.1991) (explaining *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) and *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Merely stating that the non-movant cannot meet the burden at trial is insufficient. *Id.*

If—and only if—the movant carries the initial burden, the non-movant may avoid summary judgment only by "demonstrat[ing] that there is indeed a material issue of fact that precludes summary judgment." *Id.* at 608.[5] Again, this burden varies depending upon whether the movant or non-movant bears the burden of proof at trial. If the movant has the burden of proof at trial, the non-movant may avoid summary judgment only by coming forward with evidence sufficient to withstand a motion for directed verdict at trial. *Fitzpatrick*, 2 F.3d at 1116 (citation omitted). If the non-movant bears the burden of proof at trial, the non-movant's response must be tailored to the method by which the movant carried its initial burden. If the movant presented evidence affirmatively negating a material fact, the non-movant "must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated." *Id.* If the movant demonstrated an absence of evidence on a material fact, the non-movant must either show

---

5. The non-movant cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint. *See Morris v. Ross*, 663 F.2d 1032, 1033–34 (11th Cir.1981). Rather, the non-movant must respond by affidavits or as otherwise provided by Fed.R.Civ.P. 56.

that the record contains evidence that was "overlooked or ignored" by the movant, or "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." *Id.* (citation omitted).

The clerk has given the non-moving party notice of the summary judgment motion, of the right to file affidavits or other materials in opposition, and of the consequences of default. Therefore, the notice requirements of *Griffith v. Wainwright,* 772 F.2d 822 (11th Cir.1985), are satisfied. The time for filing materials in opposition has expired, and the motion is ripe for consideration.

## III. ANALYSIS

The Record in this First Amendment free speech case is voluminous and comprehensive. Indeed, when measured end to end the thickness of the Record measures an astounding nine feet. When viewed as a matter of law, however, the Plaintiffs' have failed to meet their respective burdens in establishing these federal claims.

### A. *42 U.S.C. § 1983*

As previously stated, the Plaintiffs allege that the Defendants engaged in a vast conspiracy to violate their constitutional rights to free speech and association. In response, Defendants present numerous and individual defenses; however, all of the Defendants argue that the Plaintiffs have failed to demonstrate a First Amendment violation and the existence of a conspiracy between the state and nonstate actors.

■ Plaintiffs assert their federal free speech and association claims under 42 U.S.C. § 1983. Section 1983 creates a federal remedy for a deprivation of any federal right. *Wideman v. Shallowford Community Hosp., Inc.,* 826 F.2d 1030 (11th Cir.1987). An actionable § 1983 claim requires proof of a deprivation of rights, privileges, or immunities secured by the Constitution and laws of the United States

and that the deprivation was by a person or persons acting under color of law. *Id.* Since the majority of the Defendants are individual citizens and corporations, Plaintiffs contend that all of the Defendants acted under the color of state law because the individual citizens conspired with the state actors to violate their constitutional rights. Defendants vigorously dispute Plaintiffs' conspiracy theory.

Nevertheless, even assuming the existence of a conspiracy between the state actors, corporations, and individual citizens, Plaintiffs have failed to establish a First Amendment violation—the central issue. Examining the Record and viewing the evidence in the light most favorable to the Plaintiffs reveals that the speech was not in the role of a concerned citizen. As to the association claims, Plaintiffs failed to establish a causal connection between their association and alleged adverse employment actions. Thus, the alleged incidents of speech and association in this case are not afforded First Amendment protection. Overall, this matter is best described as nothing more than private workplace grievances that took place at a public hospital.

### B. *SECTION 1983 FREE SPEECH*

■ Plaintiffs Marshall Nero and Vicki Mitchell allege retaliation for their exercise of free speech. A section 1983 claim of retaliation for protected speech under the First Amendment is analyzed under a four-stage test. *Johnson v. Clifton,* 74 F.3d 1087, 1092 (11th Cir.1996); *Bryson v. City of Waycross,* 888 F.2d 1562, 1565 (11th Cir.1989). Under this test, a plaintiff must establish that (1) the exercise of free speech pertained to a matter of public concern, (2) the employee's First Amendment rights outweighed those of the employers in preserving the efficiency of government services, and (3) the employee's conduct was a substantial motivating factor in the adverse employment action. *Martinez v. City of Opa–Locka,* 971 F.2d 708, 712 (11th Cir.1992); *Bryson,* 888 F.2d

at 1565. If the speech were a substantial motivating factor in the termination, the burden shifts to the employer under the fourth stage to show the same decision would have been reached even in the absence of the protected speech. *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). Because Plaintiffs have not demonstrated that their speech involved a matter of public concern, summary judgment is appropriate on these claims. Further, even if a public concern were demonstrated, the other required elements are not present.

### 1. *Matter of Public Concern*

■ As a threshold matter, the Court must determine whether the speech at issue involved a matter of public concern. Because nearly anything occurring within a public hospital could be of concern to the public, the focus is not on the subject matter Plaintiffs discussed. Instead, the inquiry is "whether the speech at issue was made primarily in the employee's role as a citizen, or primarily in the role of employee." *Morris v. Crow,* 142 F.3d 1379, 1382 (11th Cir.1998) (quoting *Morgan v. Ford,* 6 F.3d 750, 755 (11th Cir. 1993)); *see also Ferrara v. Mills,* 781 F.2d 1508, 1512 (11th Cir.1986). While an employee need not publish the matter to the public to touch public concern, the employee's motivation and his efforts to communicate the concerns to the public are relevant considerations. *Kurtz v. Vickrey,* 855 F.2d 723, 727–29 (11th Cir.1988) (stating "Kurtz's profession of public concern loses force when it is considered that he took no affirmative steps ... to inform the public at large about, the problems with which he was so gravely concerned."); *see also Morgan,* 6 F.3d at 754 n. 5. Moreover, statements communicated privately to superiors still might be protected speech. *Kurtz,* 855 F.2d at 727. The most significant examination of the speech involves "the content, form, and context of the given statement, as revealed by the *whole* record." *Ferrara,* 781 F.2d at 1512 (emphasis added). "If the relevant speech was moti-

vated by personal concerns instead of public concerns then it *is not* protected by the First Amendment in this context." *Johnson,* 74 F.3d at 1092 (emphasis added).

■ The determination of whether speech is related to a matter of public concern is a question of law. *Ferrara,* 781 F.2d at 1515. The burden of proof on this issue is on Plaintiffs. *Id.* at 1514. In this case, Plaintiffs contend they spoke on matters of public concern as follows:

*Marshall Nero*

The protected speech for which Marshall Nero was retaliated against included but is not limited to his *perceived* role in reporting Dr. Wills to the State Composite Board of Medical Examiners with regard to his treatment of a patient Leslie Jackson; his criticism of the physicians' failure to follow State requirements regarding meaningful peer review and documentation of the peer review process; his *perceived* role in reporting Dr. Ed Pollock's treatment of patient # 16 to the DHR in 1995, resulting in DHR's severe criticism of Dr. Ed Pollock's treatment of this patient and Dr. Ed Pollock having to receive further education in the area of seizure disorders. (Plaintiffs' Second Am. and Supp. Compl., ¶ 119) (emphasis added).

[Additionally Plaintiffs point to] Marshall Nero's speech criticizing and objecting to the illegal payments by the Authority to Dr. Williams ... [and] improper double payments by the Authority to Drs. Williams and Stan Coe. (Plaintiffs' Resp. to Summ. of Pos. at 2–3)

*Vicki Mitchell*

The protected speech for which Vicki Mitchell was retaliated against was her *perceived* role in reporting Dr. Wills to the State Composite Board of Medical Examiners with regard to his treatment of a patient Leslie Jackson; her reporting and investigation of complaints made by nurses that Dr. Williams was sexually harassing them; and her requests of the physicians to review the care provided to patients by Drs. Wills and Pollock.

(Plaintiffs' Second Am. and Supp. Compl., ¶ 102).

[Additionally Plaintiffs point to] Vicki Mitchell's ... speech criticizing and objecting to the improper double payments by the Authority to Drs. Williams and Stan Coe. (Plaintiffs' Resp. to Summ. of Pos. at 3).

### a. *Perceived Speech*

■ Many of Plaintiffs' allegations of retaliation involve the erroneous perception by the Defendants that the Plaintiffs were reporting the Physician Defendants to state agencies. Retaliation, however, based upon erroneously perceived speech does not establish a constitutional violation; Plaintiffs must actually make the speech at issue. *Jones v. Collins,* 132 F.3d 1048, 1054 (5th Cir.1998); *Fogarty v. Boles,* 121 F.3d 886, 890 (3d Cir.1997); *Barkoo v. Melby,* 901 F.2d 613 (7th Cir. 1990). Defendants' bad motives cannot establish a First Amendment violation when there has been no speech by the Plaintiffs which serves as the basis for the retaliation. *Jones,* 132 F.3d at 1054. Thus, these erroneous perceptions cannot serve as a basis for Plaintiffs' claims and are not considered by the Court.

### b. *Marshall Nero's First Amendment Claim*

■ Plaintiff Marshall Nero brings a free speech claim pursuant to his actions prior to the Physicians' Letter and demand for resignation. A close review of these actions, however, reveals this speech was spoken in his roles as Administrator and employee, not as a private citizen. The speech which occurred prior to the Physicians' Letter directly involved the Hospital, and thus Marshall Nero as its Administrator. As Administrator of the Hospital, Marshall Nero was responsible for maintaining certification of the Hospital and ensuring its financial stability.

■ When an employee communicates matters in the "normal course of his duties" these matters are communicated as an employee and are not protected speech.

*Morris,* 142 F.3d at 1382. In *Morris,* the plaintiff, a police officer, alleged that he was fired for reporting police negligence in an accident involving an officer and a citizen. The Eleventh Circuit Court of Appeals held that a report generated by a police officer in the normal course of his duties as accident investigator was not protected speech. *Id.* The *Morris* court distinguished situations where and employee voluntary reports matters for which he has no responsibility and those reported as part of his job requirements. *Id.* Importantly, the court also noted that it could not "consider the unfairness that might have occurred if plaintiff was indeed fired for filing a truthful report and giving truthful testimony ... [t]he only issue before us is to decide if his firing was a violation of his constitutional right of free speech." *Id.* at 1383. Thus, even if the Plaintiffs in this case were doing a great job and were fired or pressured to resign, it is irrelevant to the First Amendment question if they were acting in their professional roles.

The peer review process, although carried out by the Medical Staff, directly affected the Hospital's certification. As Administrator, Marshall Nero was ultimately responsible for the peer review process and the certification, and thus he must communicate with the Chief of Staff about inspections conducted by state agencies involving the Hospital and the Medical Staff. Therefore, the letter and any other communication to the Medical Staff concerning the peer review process was carried out in Marshall Nero's capacity as Hospital Administrator and not as a concerned private citizen. Moreover, the fact that Marshall Nero did not communicate this concern to the public, while not fatal by itself, is evidence that he was merely acting as Administrator when he communicated to the Medical Staff about the peer review process. The fact that the peer review process is likely of interest to the public does not alone make it a "public concern" for First Amendment purposes. Otherwise "virtually every remark ... would

plant the seed of a constitutional case." Connick v. Myers, 461 U.S. 138, 149, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983).

Furthermore, the financial impropriety concerns directly involved the Hospital as well.[6] The Hospital's failure was Nero's failure. Thus, like the speech concerning the peer review process, the speech concerning Hospital financial matters was in Marshall Nero's capacity as Administrator and not as a concerned citizen. Also, the fact that he made no attempt to publish these financial matters, like the peer review process, is an indication of his role.

Additionally, Nero's speech after the Physicians' Letter requesting his resignation provides further evidence that his prior speech occurred in the course of his duties as Administrator. Marshall Nero did not speak about issues outside his responsibility until he became upset from the Physicians' Letter. (Marshall Nero's Deposition at 176–77). In these later allegations, Marshall Nero complained about Medicaid fraud by non-hospital employee Defendants and alleged drug abuse by Dr. Eugene Pollock. Moreover, he requested the publication of Dr. Wills's reprimand. These were issues outside Marshall Nero's responsibility and authority. While important issues, these issues did not directly affect the financial coffers of the Hospital nor its certification. If Marshall Nero was speaking as a *citizen* prior to the Physicians' Letter instead of speaking as an employee, he would have spoken about these other important issues that he *was not directly* responsible for as well.

**6.** Although the Authority was responsible for authorizing these payments, the overall amount of funds available to the Hospital was clearly a direct concern of the Administrator.

**7.** The Court notes that in two of the Plaintiffs' briefs, Plaintiffs contend that Murray Mitchell spoke out about financial matters related to the "double payments." Plaintiffs argue this claim despite their contention in the Amended Complaint that Murray Mitchell only claims First Amendment association retaliation. "Murray Mitchell claims he was retaliated against because of his association and marriage to Vicki Mitchell." (*See* Plaintiffs' Sec-

### c. *Vicki Mitchell's First Amendment Claim*

Vicki Mitchell's primary contention on her First Amendment claim pertains to the alleged sexual harassment of her nurses by Dr. Williams. Plaintiffs are correct that sexual harassment can be a matter of public concern. *Tindal v. Montgomery County Comm'n.*, 32 F.3d 1535, 1540 (11th Cir.1994). Like Marshall Nero, however, Vicki Mitchell's speech concerning alleged sexual harassment occurred in her role as an employee and not as a concerned citizen. Plaintiffs' own brief demonstrates her role. "Mitchell, *as the supervisor* of Williams' victims, brought the matter to the Board's attention." (Plaintiffs' Brief at 17) (emphasis added). Also similar to Marshall Nero, Vicki Mitchell never spoke to the media nor attempted to bring any matters to the public's attention. (Vicki Mitchell's Deposition at 194).

Additionally, Vicki Mitchell contends that she too spoke out on the alleged double payments to Drs. Stan Coe and Williams. Specifically, she states that she informed her coplaintiff Marshall Nero and Coastal's Director about the double payments. As before, Vicki Mitchell made no efforts to communicate her concerns to the public. Considering this and the entire Record, I conclude that Vicki Mitchell spoke on these matters in her role as Director of Nursing and not as a concerned citizen. The Court "will not permit an employee to manufacture First Amendment protection (thereby job security) by complaining on a matter related to a social concern." *Morgan,* 6 F.3d at 755 n. 7.[7]

ond Am. and Supp. Compl., ¶ 114). To the extent Murray Mitchell spoke about these financial matters, the Record is clear that he spoke in his capacity as CFO for the Hospital, and thus his speech is not accorded First Amendment protection.

Additionally, in Plaintiffs' Amended Complaint, Barbara Nero contends that she spoke out on matters of public concern when she wrote the letter to the FTC alleging antitrust violations. "The protected speech for which Barbara Nero was retaliated against was her letter to the Federal Trade Commission reporting the physician defendants' boycott of Wills Memorial Hospital." (Plaintiffs' Second

## 2. Balancing the Parties' Interests

■ The second prong of a First Amendment free speech claim is commonly referred to as the *Pickering* balance. Assuming arguendo, that Plaintiffs Marshall Nero and Vicki Mitchell's speech can be viewed as given in their roles as citizens, and thus touching upon a matter of public concern, they must show that their speech outweighs the Authority's interest. A review, however, reveals that they have not met their burden.

The *Pickering* balance affords the government *broad* discretion for its actions. *Johnson v. Clifton*, 74 F.3d 1087, 1092 (11th Cir.1996). The analysis, requires balancing "between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Board of Educ.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). Importantly, this balance reflects the "*common sense* realization that government offices could not function if every employment decision became a constitutional matter." *Connick v. Myers*, 461 U.S. 138, 143, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) (emphasis added). Generally, where "close working relationships are essential in fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate." *Goffer v. Marbury*, 956 F.2d 1045, 1049 (11th Cir.1992). This balancing, however, requires an "ad hoc case-by-case application" and "[t]he cases are, therefore, not good sources for the rules of general application." *Id.* at 1050. The nature of the services that hospital provides clearly requires that the staff and the administration have a "har-

monious and cooperative working relationship." *Sweeney v. Athens Regional Medical Center*, 705 F.Supp. 1556, 1569 (M.D.Ga.1989).

### a. Marshall Nero

Previously, the Court analyzed three separate instances of speech alleged by Marshall Nero. Looking at these instances separately,[8] it is clear that the interest of the Hospital outweighs Marshall Nero's free speech interest. Under the unique facts of this case, the Authority was faced with the ultimate task of keeping the Hospital's doors open. The dissension that had arisen between the Administration and the Medical Staff as a result Marshall Nero's speech obviously required some action. These internal disputes sometimes "justify drastic action." *Goffer*, 956 F.2d at 1050. When faced with threats of a Hospital boycott by the Medical Staff if the Administration was not replaced, great deference should be afforded to the Authority's decision to seek Marshall Nero's resignation.[9] Accordingly, I conclude that the Hospital's interest separately outweighed each of Marshall Nero's allegations of protected speech.

### b. Vicki Mitchell

Setting aside the remoteness in time between the demand for her resignation and other causation issues addressed below, the Authority was similarly faced with a relationship of turmoil and dissension between the Medical Staff and Vicki Mitchell. Plaintiffs contend that the Physician Defendants continuously sought her removal with threats of boycotts. As stated above, however, any personnel decision made to keep the Hospital running and

Am. and Supp. Compl., ¶ 108). This letter was written well after the Physicians' Letter, and at the hearing on September 30, 1998, Plaintiffs' counsel stated that Barbara Nero only contends that she has a First Amendment association claim. (Trans., Sept. 30, 1998 Hearing, at 73). Thus, any allegation concerning the FTC letter is not protected under the First Amendment.

8. Under a *Pickering* balancing, the courts generally must balance each instance of speech separately. *Goffer*, 956 F.2d at 1050.

9. Indeed, Plaintiffs' counsel stated at the summary judgment hearing that "the Hospital Authority, when faced with making a choice between the doctors wrath and relative importance of my clients, did an understandable thing." (Hearing Transcript at 82).

open should be accorded great deference. Additionally, aside from the internal disputes, the Hospital's doors were being threatened to be closed from within as a result of the Hospital's financial condition that Vicki Mitchell as an administrator was, at least, partially responsible for. Accordingly, I conclude that the Hospital's interest separately outweighed Vicki Mitchell's allegation of protected speech. Thus, any decision to discontinue her employment is not actionable under § 1983.

### 3. *Causation*

█ Even if Marshall Nero and Vicki Mitchell were able to establish that their speech outweighed the Authority's interest in running the Hospital, Plaintiffs have failed to establish causation. Under the third prong, a plaintiff must establish that his speech or association was a substantial motivating factor in the alleged "adverse employment action." *Morgan,* 6 F.3d at 754. Although this Court has concluded based upon a thorough review of the Record that as a matter of law that Plaintiffs' speech claims are not actionable under § 1983, it is crucial to note that even when viewed in a light most favorable to the Plaintiffs, there is insufficient evidence to support a jury finding that the Plaintiffs' departures were motivated, in substantial part, because of their speech.

█ First, it is necessary to establish an "adverse employment action." " 'Adverse employment action' is broadly defined and as a matter of law includes not only discharges, but also demotions, refusals to hire, refusals to promote, and reprimands." *McCabe v. Sharrett,* 12 F.3d 1558, 1563 (11th Cir.1994). An adverse employment action can also take the form of a constructive discharge where an employee resigns. To show a constructive discharge, however, a plaintiff must provide evidence that his or her working conditions were so intolerable that a reasonable person in that position would be compelled to resign. *Morgan,* 6 F.3d at 754. Thus, "when an employee voluntarily quits under circumstances insufficient to amount to a constructive discharge,

there has been no adverse employment action." *Hartsell v. Duplex Prod., Inc.,* 123 F.3d 766, 775 (4th Cir.1997) (internal quotes omitted). "[R]esignations can be voluntary even where the only alternative to resignation is facing possible termination." *Hargray v. City of Hallandale,* 57 F.3d 1560, 1568 (11th Cir.1995). The threat of termination cannot compel a person to resign because an employee has a choice of resigning or standing and fighting the threatened termination. *Id.*

### a. *Marshall Nero*

Marshall Nero cannot establish that he suffered an "adverse employment action," despite his contention that his employment was terminated. The evidence conclusively shows that he voluntarily resigned in exchange for a substantial monetary settlement. As previously stated, Marshall Nero, the Physician Defendants, and the Authority met on March 20, 1996, to discuss a resolution to the dissension. Marshall Nero himself described the meeting as a "big stalemate." (Marshall Nero's Deposition at 208). The Authority felt the only way to end the impasse was to appoint a new Administrator. Thus, the Authority requested Marshall Nero's resignation in exchange for a monetary settlement.

The Authority gave Marshall Nero one week to propose an acceptable settlement. Marshall Nero retained an attorney and proposed a settlement, which he contends was rejected by the Authority's attorney. Marshall Nero asserts that he was offered the sum of $60,000 plus other benefits on March 26, 1996, conditioned upon his acceptance of the Authority's offer that day or otherwise face termination. Marshall Nero accepted the settlement and resigned on March 27, 1996.

In the context of this litigation, Marshall Nero contends that the resignation was involuntary and that he was terminated. In support, he points to the Eleventh Circuit Court of Appeal's opinion in *Puentes v. United Parcel Serv., Inc.,* 86 F.3d 196

(11th Cir.1996). In *Puentes,* the court held that, absent some justified reason for urgency, a settlement release conditioned upon acceptance in twenty-four hours is not executed knowingly and voluntarily. *Puentes,* however, is not applicable to this case because the release that Marshall Nero entered into with the Authority had a seven-day revocation period. During the seven days following the execution, either party could nullify the agreement for any reason. Therefore, Marshall Nero had ample time to consider and reconsider the matter. Marshall Nero did not exercise his revocation rights. Despite his contention that he was threatened with termination, Marshall Nero voluntarily resigned. *Hargray,* 57 F.3d at 1568. Thus, there was no "adverse employment action" under the third prong.

b. *Vicki Mitchell*

Vicki Mitchell contends that she was terminated for her speech; however, the Record clearly indicates the contrary. Vicki Mitchell does not allege that she was "constructively discharged," but contends that she was actually terminated and denies resigning. On the other hand, Defendants vigorously contend that she did in fact resign and point to compelling evidence in support. First, Vicki Mitchell does not deny that she stated in writing on three separate job applications that she resigned her employment with the Hospital. Second, she does not deny that she told the local newspaper that she had resigned. Vicki Mitchell also provided an uncontested statement to James Jarrett that "she wants to do what's right for the hospital, even if it meant eventually not being Director of Nursing." In light of this evidence, there is insufficient evidence for a jury to find that she was terminated. Thus, there was no "adverse employment action" under the third prong.

C. *SECTION 1983 FIRST AMEND-MENT ASSOCIATION*

 Both Barbara Nero and Murray Mitchell primarily claim that the Defendants retaliated against them for being married to Marshall Nero and Vicki Mitchell respectively. There are "two different forms of association, intimate association and expressive association." *McCabe v. Sharrett,* 12 F.3d 1558, 1562–63 (11th Cir. 1994) (internal quotes omitted). Intimate association encompasses marriage, the association claimed by Plaintiffs. *Id.* at 1563. Generally, intimate association is not protected by the First Amendment, but instead is a personal liberty protected by the Fourteenth Amendment. *Id.* However, a single association can possess both intimate and expressive association features. *Id.* Plaintiffs contend that their intimate association involves First Amendment expressive association. While I concluded that the spouses' speech did not involve matters of *public concern* under a First Amendment analysis, "associational activity need not relate to a matter of public concern for First Amendment protection to apply." *Schneider v. Indian River Community College Found., Inc.,* 875 F.2d 1537, 1543 n. 6 (11th Cir.1989) (citing *Hatcher v. Board of Public Educ. & Orphanage,* 809 F.2d 1546, 1558 (11th Cir. 1987)). Although a plaintiff presenting an association claim need not show a "public concern," the remaining elements under a First Amendment speech claim are still applicable. *See McCabe,* 12 F.3d at 1563–64; *Shahar v. Bowers,* 114 F.3d 1097, 1102–03 (11th Cir.1997) (en banc) (finding the *Pickering* balance applicable to association claims).

1. *Balancing the Parties' Interests*

 Like Marshall Nero and Vicki Mitchell, their spouses, Murray Mitchell and Barbara Nero, must also show that their association outweighs the Authority's interest in running the Hospital. Setting aside the remoteness in time between the demand for their resignations and other causation issues addressed below, the Authority was similarly faced with a relationship of turmoil and dissension between the Medical Staff and these administrators. Plaintiffs contend that the Physician Defendants continuously sought their removal

with threats of boycotts. As stated above, however, any personnel decision made to keep the Hospital running and open should be accorded great deference. Additionally, aside from the internal disputes, the Hospital's doors were threatened to be closed from within as a result of the Hospital's financial condition that these very administrators were, at least, partially responsible for. Accordingly, I conclude that the Hospital's interest separately outweighed each of these Plaintiffs allegations of association retaliation. Thus, any decision to discontinue these Plaintiff's employment is not actionable under § 1983.

### 2. *Plaintiffs' Lack of Causation*

 Like Marshall and Vicki Mitchell, it is important to note that even when viewed in a light most favorable to these Plaintiffs, there is insufficient evidence to support a jury finding that the Murray Mitchell and Barbara Nero's departures were motivated, in substantial part, because of their associations to their spouses.

Consequently, even if Murray Mitchell's association with Vicki Mitchell outweighed the Hospital's interest, he cannot establish the requisite causation. Plaintiff Murray Mitchell claims "constructive discharge" and the receipt of a reprimand as "adverse employment actions" by the Defendants. Murray Mitchell, however, fails to provide evidence of a constructive discharge or that his reprimands were motivated by his association to Vicki Mitchell. Specifically, he states that he saw "the writing on the wall" [10] and began to seek another position. However, he has presented no evidence that his job conditions were so intolerable for the Court to find a constructive discharge. Indeed, when the local newspaper contacted him about his resignation, he stated "My leaving is entirely voluntary." (Murray Mitchell's Deposition, Exhibit 9).

As to Murray's contention that he received two reprimands in retaliation for his association with Vicki Mitchell, it too is without merit. The reprimands came from Quorum and addressed problems associated with the financial matters of the Hospital. These reprimands also informed Murray Mitchell that his performance was substandard for that expected of a CFO. While a reprimand can be an "adverse employment action," there is insufficient evidence for a jury to conclude that these reprimands were substantially motivated by his association with Vicki Mitchell. Plaintiffs do not contest that the Hospital was in financial disarray and as a result some 74 employees had to be laid off to keep the Hospital operating. As CFO, Murray Mitchell was primarily responsible for the Hospital's financial matters, and thus common sense dictates that the reason for the reprimand was to help correct the dismal financial situation and not as retaliation for his association. Thus, Murray Mitchell failed to meet his burden of demonstrating causation because there was no constructive discharge and the reprimands were not substantially motivated by his association with Vicki Mitchell.

Like the other Plaintiffs, Barbara Nero has failed to establish the requisite causation. While her termination constitutes an "adverse employment action," she has failed to show that her termination, as a result of the Hospital layoff, was substantially motivated by her association with Marshall Nero. As already stated, Plaintiffs do not contest that the Hospital was in financial trouble and that layoffs were necessary. Instead, Plaintiffs argue that Barbara Nero should not have been one of those selected for the layoff. The Court first notes that the remoteness in time from the letter in February to the layoff in October seriously militates against a finding that the layoff was substantially motivated by her association. Additionally, Barbara Nero was the highest paid of four other department heads that were terminated as part of the reduction in force to alleviate the one million-dollar shortfall.

---

**10.** This apparently alludes to the threat of possible termination; however, as previously stated, the threat of termination does not make a resignation involuntary. *Hargray,* 57 F.3d at 1568.

If the Hospital had to reduce costs, great deference should be afforded to its decision to lay off some of its highest paid employees.

### D. *SAME RESULT*

The final consideration in a free speech retaliation claim or association claim is whether the public agency can prove by a preponderance of the evidence that it would have reached the same decision as to the adverse employment action even in the absence of the protected conduct. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). As administrators of the Hospital, these four Plaintiffs were responsible for its success or its failure—particularly Marshall Nero and Murray Mitchell. The financial condition of the Hospital eventually resulted in the layoff of 74 employees. There is ample evidence that because of the financial situation, that the Authority would have sought Plaintiff's resignations or outright terminated their employment as part of a reduction in force.

In conclusion, it is clear that this situation was nothing more than a workplace dispute undeserving of any constitutional protection. In addition to the Plaintiffs' own acts of retaliation, Barbara Nero disrupted the public service the Hospital performs by taking the lab manuals—the same public service she and her coplaintiffs so vehemently contend they were attempting to protect. The Court will not permit these Plaintiffs to manufacture First Amendment protection, and thereby job security, by complaining on matters related to a public concern and then using complaints to retaliate for personal disputes. As the Eighth Circuit Court of Appeals stated in *Smith v. Cleburne County Hospital,* 870 F.2d 1375, 1383 (8th Cir. 1989), "when a person does initially engage in protected First Amendment speech on matters of a public concern, they may not use this protection, in the guise of public concern, to also level personal attacks ... which causes disruption, disharmony, dissension, and creates an adverse economic

effect on the public service the institution performs."

Having determined that Plaintiffs failed to prove their First Amendment claims, I find it unnecessary to address the conspiracy issue and the other individual defenses raised by the Defendants.

### E. *FLSA CLAIM*

Barbara Nero contends that she is entitled to unpaid overtime wages under FLSA. For the reasons stated below, however, the Authority is entitled to summary judgment on her claim.

Congress enacted the FLSA to "guarantee either regular or overtime compensation for all actual work or employment." *Tennessee Coal, Iron & R. Co. v. Muscoda Local No. 123,* 321 U.S. 590, 597, 64 S.Ct. 698, 88 L.Ed. 949 (1944). The FLSA generally requires employers to pay overtime for "employment in excess of [forty hours] at a rate not less than one and one-half times the regular rate at which [the employee] is employed." § 29 U.S.C. 207(a)(1). Generally, courts have construed work to mean all activities "controlled or required by the employer and pursued necessarily and primarily for the benefit of his employer and his business." *Muscoda,* 321 U.S. at 598, 64 S.Ct. 698

■ In order to establish a prima facie violation of the FLSA, a plaintiff must show "as a matter of just and reasonable inference that the wages paid to him did not satisfy the requirements of the FLSA." *Donovan v. New Floridian Hotel, Inc.,* 676 F.2d 468, 475 n. 12 (11th Cir.1982). For an employer to be liable for unpaid overtime under FLSA, it must have actual or constructive knowledge of the overtime. *Reich v. Department of Conservation & Natural Resources,* 28 F.3d 1076, 1081–82.

■ Specifically, Barbara Nero contends that she spent several hundred hours working on lab manuals at home and that the Hospital is required to pay her overtime. Although her direct supervisor was her husband, she never attempted to

claim overtime for the lab manuals until this litigation ensued. Defendants first contend that her payroll records show that she submitted overtime for nearly every pay period during her tenure at the Hospital. Moreover, Defendants note that Barbara Nero admitted that she could have previously submitted overtime for the work she did at home but did not. In fact, she worked on the manuals at home on occasion during her regular shift when she was not needed at the Hospital and reported those hours. (Barbara Nero's Deposition at 246).

While the Court could not locate any Eleventh Circuit case law clearly on point, the Defendants point to a similar Tenth Circuit case. *Whitaker v. Pacific Enter. Oil Co.,* 1992 WL 44729, 956 F.2d 1170 (10th Cir.1992) (unpublished opinion). In *Whitaker,* the plaintiff attempted to claim an additional 638 hours of unreported overtime for the same time period in which he had reported 279 hours of overtime. The court found that the plaintiff failed to show that his employer had actual or constructive knowledge of the overtime where the plaintiff had regularly reported overtime but failed to report additional overtime for the same period. Similarly, Barbara Nero has failed to show that the Hospital had actual or constructive knowledge of this alleged overtime. The Hospital knew she regularly reported overtime during this period and knew that she actually reported nonovertime, or regular hours, for work done on the manuals at home. There was no reason for the Hospital to suspect that she had not reported all of her hours. The Court will not attempt to discern her motivation in bringing this claim, the reason she did not report this alleged overtime in the first place, or why she removed the manuals from the Hospital when she was dismissed. In short, however, Barbara Nero has failed to meet her burden of establishing a *prima facie* case under FLSA.

### F. *STATE CLAIMS*

The Court will generally not entertain a pendant state claim if the federal claims are summarily resolved. *See Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988). I find no reason to entertain the state claims here. Thus, the state claims for intentional interference with employment relations and defamation and the counterclaims for breach of settlement agreement belong in state court.

### IV. CONCLUSION

Upon the forgoing, Plaintiffs have failed to prove a First Amendment claim—the central issue. Additionally, Barbara Nero failed to prove a claim for overtime compensation under FLSA. Thus, it is hereby **ORDERED** that Defendants' motions for summary judgment are **GRANTED**.

Having determined Plaintiffs have stated no viable federal claims, the Court declines to exercise jurisdiction over Plaintiffs' state law claims and Defendants' counterclaims, which are **REMANDED** to the Superior Court of Wilkes County. The Clerk is instructed to **ENTER FINAL JUDGMENT** in favor of Defendants as to all federal claims and **CLOSE** this case. Costs in this action are taxed against Plaintiffs.