Jacqueline R. MORGAN,
Plaintiff–Appellant,

v.

John FORD, Individually and in his official capacity as an officer of the Georgia Department of Corrections, Tydus Meadows, Individually and in his official capacity as an officer of the Georgia Department of Corrections; Chuck Burton, Individually and in his official capacity as an officer of the Georgia Department of Corrections; Robert Whitmore, in his official capacity as Commissioner of the Georgia Department of Corrections and Georgia Department of Corrections, Defendants–Appellees.

David Evans, etc., Defendant.

No. 91–8816.

United States Court of Appeals,
Eleventh Circuit.

Nov. 9, 1993.

Amy S. Gellins, Athens, GA, for plaintiff-appellant.

George M. Weaver, England, Weaver & Kytle, Atlanta, GA, for defendants-appellees.

Before TJOFLAT, Chief Judge, HATCHETT and BIRCH, Circuit Judges.

PER CURIAM:

In this case, Jacqueline Morgan claims that she left her job with the Georgia Department of Corrections because three of her supervisors subjected her to sexual harassment in the workplace. She seeks an injunctive order, under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. (1988), requiring the Department of Corrections to reinstate her to her position, with back pay and fringe benefits. Morgan also claims that when she exercised her First Amendment right of free speech and complained about the sexual harassment, these supervisors retaliated against her. Accordingly, she seeks compensatory and punitive damages against them, under 42 U.S.C. § 1983 (1988).

The district court found no merit in any of Morgan's claims, and therefore granted summary judgment against her. We agree with the district court's disposition of Morgan's section 1983 claims against the supervisors, and thus affirm that disposition. We vacate, however, the judgment for the Department of Corrections, and remand Morgan's case for reinstatement for further proceedings, because a material issue of fact remains to be litigated.

I.

Jacqueline Morgan went to work for the Georgia Department of Corrections (the Department) in 1984. The Department assigned her to the Augusta Correctional Medical Institute (ACMI); her position was Correctional Officer I (COI). Lieutenant John

Ford, one of the defendants sued in this case, was her immediate supervisor. He supervised Morgan for two periods during her employment at ACMI: for her initial six months and for a time in 1987.

Soon after Morgan came to work, Ford directed Correctional Officer Kenneth Carswell to ask Morgan if she would be interested in going on a date with Ford. Morgan told Carswell that she was not interested in seeing Ford socially.

Upon receiving this response, Ford told Morgan that she "had not had a real man until she had him." Ford made statements to this effect to Morgan, and to other female employees, throughout Morgan's employment at ACMI. After telling Morgan "that she had not had a real man until she had him," Ford began to spend long periods—up to three or four hours at a time—at Morgan's work station. While there, he would scrutinize the minutiae of Morgan's work, and engage her in unwanted conversation. During one of these episodes, Ford boasted that Charles Burden, ACMI's Superintendent and another defendant in this case, had told him that "[Ford] could not get his pussy and his paycheck in the same place," but that "what [Burden] doesn't know won't hurt him." On occasions, Ford remarked that "there is a thin line between love and hate and someday [Morgan] will realize that [she] love[s] [Ford]," or words to that effect. Once, while on her way to a party for ACMI employees, Ford told Morgan that she looked good in her dress and that he "could imagine her without it."

Ford's conduct troubled Morgan. She claims that after sharing her concerns about Ford with a fellow officer one evening at work, she discovered that Ford had electronically monitored her conversation.

After Morgan had been on the job for six months, Ford changed shifts and no longer supervised Morgan's work. Although they saw each other infrequently, Ford's troubling behavior did not cease; he continued to comment on his virtues.

In 1987, Morgan left ACMI for several weeks to go on military leave. Upon her return, Ford again served as her supervisor.

At her annual evaluation, in June of 1987, Ford rated her 3.4 on a 5–point scale.

In September 1987, one of Morgan's co-workers, Sheila Parrish, lodged a sexual harassment complaint against Ford with Superintendent Burden. In her complaint, Parrish cited Ford's unwanted attentions and habitual sexually suggestive comments. Parrish identified Morgan as a witness who could substantiate her allegations.

At Burden's request, Morgan met with Burden to discuss Ford's actions toward Parrish. At that meeting, Morgan told Burden about Ford's behavior—toward her as well as Parrish. Burden suggested that Morgan take her charges to the Department's Internal Affairs Division, which she promptly did.

Ford soon learned of Morgan's meeting with Burden, and within two weeks he took action against her. Ford disciplined Morgan for failing to respond to an "officer needs assistance" call, although a witness testified to the contrary. Ford then instructed lieutenants with supervisory authority over Morgan to watch her closely and to write her up for the smallest of infractions. Shortly thereafter, Lieutenant Tydus Meadows, another defendant before us, disciplined Morgan for being rude to a visitor; he did so in the face of a witness' testimony that she had not been rude.

In early October 1987, Internal Affairs completed its investigation and sent a report thereof to Burden. After reading the report, Burden concluded that Morgan had not been sexually harassed. On October 9, 1987, he informed Morgan in writing that she had not established her claims of sexual harassment and admonished her against bringing false claims against her supervisors. He warned her that she would be disciplined for any further "misconduct." Burden also wrote to Ford. He told Ford that although there was no finding of sexual harassment, he should not "plac[e himself] in a position which could be construed as personal." Burden took no other action in the matter.

On November 3, 1987, Ford gave Morgan an interim rating of 2.6 on a scale of 5, significantly lower than the rating he had

given her in June. An interim review is an extraordinary procedure which is used to register a supervisor's strong impressions of an employee's performance. Ford gave Morgan a 2.6 rating because, he said, she had exhibited a poor attitude and was uncooperative. On November 9, 1987, Morgan filed a sexual harassment charge against Ford with the Georgia Office of Fair Employment Practices. When notified of the charge, Ford told Morgan to drop it because "no one would believe her." Immediately thereafter, Morgan found herself reassigned to the more distasteful duties around the compound. Ford assigned Morgan to the guard tower although she did not have a proper weapons certification, to the unit for AIDS patients, and to the housing ward for violent inmates.

Ford's supervision of Morgan ended in November 1987. Although Ford no longer had direct control over her, Morgan claims that he continued to engage other officers to make her working environment unpleasant. In April 1988, Morgan resigned. In August 1989, the Office of Fair Employment Practices issued a finding of reasonable cause to believe that the Department had discriminated against Morgan and had retaliated against her for opposing perceived discriminatory practices.

On October 6, 1989, Morgan brought this suit against Ford, Meadows, and Burden in their individual and official capacities,[1] seeking compensatory and punitive damages, under 42 U.S.C. § 1983,[2] for retaliating against her for complaining, purportedly in the exercise of her First Amendment right of free speech, about sexual harassment against her in the workplace. On January 30, 1990, Mor-

gan filed an Amended Complaint adding Robert Whitworth, in his official capacity as Commissioner of the Georgia Department of Corrections, as a party defendant, and seeking an order requiring Whitworth to reinstate her to the job she left because of the harassment she had received at the hands of Ford, Meadows, and Burden. On April 12, 1990, Morgan again amended her Complaint, adding the Department of Corrections as a party defendant and seeking an order, under Title VII, requiring the Department to reinstate her to her position.[3]

After the parties joined issue and engaged in considerable discovery, the district court granted the defendants summary judgment. Morgan now appeals.

## II.

In the discussion that follows, we first address Morgan's First Amendment claims for damages against Ford, Meadows, and Burden. We then turn to Morgan's Title VII claim.

## A.

Morgan claims that Ford, Meadows, and Burden abridged her First Amendment right to free speech[4] after she complained to Burden, the Internal Affairs Division, and the Georgia Office of Fair Employment Practices that she was being harassed in the workplace. We agree with the district court that Morgan suffered no constitutional deprivation.

 A state may not demote or discharge a public employee in retaliation for

---

1. Morgan also sued David Evans in his official capacity as Commissioner of the Georgia Department of Corrections. She dropped him from the case when Robert Whitworth assumed that position.

2. Section 1983 provides, in relevant part, as follows:
 Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ..., subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured....

42 U.S.C. § 1983.

3. Morgan also seeks such relief from Whitworth. Because, for purposes of this Title VII claim, Whitworth and the Department are essentially one and the same, we refer to them hereafter collectively as the "Department."

4. The First Amendment provides that "Congress shall make no law ... abridging the freedom of speech...." U.S. Const. amend. I. This right was made applicable to the states by the Fourteenth Amendment. *Everson v. Board of Educ.*, 330 U.S. 1, 8, 67 S.Ct. 504, 507–08, 91 L.Ed. 711 (1947).

protected speech. *Bryson v. City of Way-cross*, 888 F.2d 1562, 1565 (11th Cir.1989) (citing *Rankin v. McPherson*, 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987)). This circuit has developed a four-part test to determine whether an employee suffered such retaliation. First, a court must determine "whether the employee's speech may be 'fairly characterized as constituting speech on a matter of public concern.'" *Bryson*, 888 F.2d at 1565 (quoting *Rankin*, 483 U.S. at 384, 107 S.Ct. at 2896–97 (citation omitted)). *See also Kurtz v. Vickrey*, 855 F.2d 723 (11th Cir.1988); *Ferrara v. Mills*, 781 F.2d 1508, 1512 (11th Cir.1986). If so, the district court must "weigh[ ] the employee's first amendment interests against 'the interest of the state, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Bryson*, 888 F.2d at 1565 (*quoting Pickering v. Board of Educ.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734–35, 20 L.Ed.2d 811 (1968)). Should the employee prevail on the balancing test, "the fact-finder determines whether the employee's speech played a 'substantial part' in the government's decision to demote or discharge the employee." *Id.* (citing *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)). Finally, if the employee shows that the speech was a substantial motivating factor in the employment decision, "the state must prove by a preponderance of the evidence that 'it would have reached the same decision ... even in the absence of the protected conduct.'" *Id.* at 1566 (quoting *Mt. Healthy*, 429 U.S. at 286, 97 S.Ct. at 576).

Applying this four-part test, we first examine whether Morgan's speech related to a matter of "public concern." Morgan contends that her speech—the complaints of sexual harassment—involves a public concern, because sexual harassment in the workplace is a matter of vital social interest.

■■■ To fall within the realm of the "public concern," an employee's speech must

"relat[e] to a[ ] matter of political, social, or other concern to the community." *Connick v. Meyers*, 461 U.S. 138, 146, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983). Absent extraordinary circumstances, however, First Amendment protection remains unavailable when "a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest...." *Id.* at 147, 103 S.Ct. at 1690. A court must therefore discern the purpose of the employee's speech—that is, whether she spoke on behalf of the public as a citizen, or whether the employee spoke for herself as an employee. *Id.* at 146, 103 S.Ct. at 1690; *Kurtz*, 855 F.2d at 730; *Ferrara*, 781 F.2d at 1515–16. To accomplish this, a court considers "the content, form and context of a given statement, as revealed by the whole record." *Deremo v. Watkins*, 939 F.2d 908, 910 (11th Cir.1991) (citing *Connick*, 461 U.S. at 147–48, 103 S.Ct. at 1690). A court may consider the employee's attempts to make the concerns public,[5] along with "the employee's motivation in speaking." *Id.* at 911 (citations omitted).

■■■ While we heartily agree with Morgan that sexual harassment in the workplace is a matter of important social interest, "'the mere fact that the topic of the employee's speech was one in which the public might or would have had a great interest is of little moment.'" *Kurtz*, 855 F.2d at 727 (quoting *Terrell v. University of Tex. Sys. Police*, 792 F.2d 1360, 1362 (5th Cir.1986), *cert. denied*, 479 U.S. 1064, 107 S.Ct. 948, 93 L.Ed.2d 997 (1987)). Rather, we must determine whether the purpose of Morgan's speech was to raise issues of public concern, on the one hand, or to further her own private interest, on the other. *See Deremo*, 939 F.2d at 912 (employees' request for compensation for remaining silent about sexual harassment did not constitute a matter of public concern); *Callaway v. Hafeman*, 832 F.2d 414, 417 (7th Cir.1987) (employee's private complaints of sexual harassment were not matter of public con-

---

5. We understand that a court cannot determine that an utterance is not a matter of public concern *solely* because the employee does not air the concerns to the public. *Deremo*, 939 F.2d at 911 n. 3 (citing *Kurtz v. Vickrey*, 855 F.2d 723, 727 (11th Cir.1988)). The employee's attempt at public disclosure nonetheless remains a relevant factor in determining whether the speech was a matter of public concern. *Id.; see also Kurtz*, 855 F.2d at 729; *Terrell v. University of Tex. Sys. Police*, 792 F.2d 1360, 1362–63 (5th Cir.1986).

cern); *see also Marshall v. Allen,* 984 F.2d 787, 796 (7th Cir.1993) (male co-worker's verbal support for victims of sexual harassment constituted speech touching upon a public concern).

In the case at hand, Morgan's speech largely focused upon how Ford behaved toward her and how that conduct affected her work. The speech that Morgan cites is in the form of complaints to official bodies—the Superintendent of ACMI, Internal Affairs, and the Office of Fair Employment Practices. She did not relate her concerns about sexual harassment to the public,[6] or attempt to involve the public in any manner. Morgan's expressions "in no way dr[ew] the public at large or its concerns into the picture." *Pearson v. Macon Bibb County Hosp. Auth.,* 952 F.2d 1274, 1279 (11th Cir.1992). The record shows that Morgan's speech was driven by her own entirely rational self-interest in improving the conditions of her employment. Her complaints about Ford's behavior, as serious as they were, centered around her private matters, not matters of social interest. As an employee grievance, Morgan's speech was not a matter of public concern. *See Connick,* 461 U.S. at 146–47, 103 S.Ct. at 1690; *Ferrara,* 781 F.2d at 1512; *Renfroe v. Kirkpatrick,* 722 F.2d 714, 715 (11th Cir.), *cert. denied,* 469 U.S. 823, 105 S.Ct. 98, 83 L.Ed.2d 44 (1984).[7]

That Morgan spoke on behalf of Sheila Parrish regarding Ford's harassing behavior does not change the outcome. An employee's speech will rarely be entirely private or entirely public. Rather than categorize each phrase the employee uttered, we "consider whether the speech at issue was made primarily in the employee's role as citizen, or primarily in the role of employee." *Kurtz,* 855 F.2d at 727 (citing *Connick,* 461 U.S. at 147, 103 S.Ct. at 1690); *see Pearson,* 952 F.2d at 1278 ("Pearson's complaints primarily pertained to ... [her employee grievance]. It was only incident to speaking on these concerns that [her] remarks touched on [what could be considered a public concern.]"). Considering the entire record, we conclude that Morgan primarily spoke as an employee in order to improve her work environment. While she did speak about her co-worker's plight, which contains a public concern aspect, *see Marshall,* 984 F.2d at 796, the main thrust of her speech took the form of a private employee grievance. Summary judgment on Morgan's section 1983 claim was therefore appropriate.

### B.

 Morgan claims that she was constructively discharged by the Department in violation of Title VII.[8] "[W]hen an employee involuntarily resigns in order to escape intolerable and illegal employment requirements to which he or she is subjected because of race, color, religion, sex, or national origin, the employer has committed a constructive discharge in violation of Title VII." *Henson v. City of Dundee,* 682 F.2d 897, 907 (11th Cir.1982) (quoting *Young v. Southwestern Savings & Loan Ass'n,* 509 F.2d 140, 144 (5th Cir.1975) (internal quotation marks omitted)). Moreover, a plaintiff "must demonstrate that [her] working conditions were so intolerable that a reasonable person in [her] position would be compelled to resign."

---

**6.** *See Martinez v. City of Opa–Locka,* 971 F.2d 708, 710 (11th Cir.1992) (providing testimony regarding the public disposition of money); *Stough v. Gallagher,* 967 F.2d 1523, 1524, 1528 (11th Cir.1992) (campaigning publicly for sheriff candidate); *Stewart v. Baldwin County Bd. of Educ.,* 908 F.2d 1499, 1506 (11th Cir.1990) (expressing opposition to tax referendum at Superintendent's meeting); *Williams v. Roberts,* 904 F.2d 634, 638 (11th Cir.1990) (publishing criticism of budget proposal); *see also Rode v. Dellarciprete,* 845 F.2d 1195 (3d Cir.1988) (giving television interview about experiencing racial discrimination on the State Police Force).

**7.** Our statement in *Deremo* is not to the contrary. There we stated in dicta that "[w]e assume that an employee's complaint to a superior reporting the wrongful conduct of a public official, including sexual harassment, would ordinarily be a matter of public concern." *Deremo,* 939 F.2d at 912. While we agree that the general subject of sexual harassment in the workplace is a matter of public concern, each complaint must be assessed on a case-by-case basis. We will not permit an employee to manufacture First Amendment protection (thereby job security) by complaining on a matter related to a social concern.

**8.** Title VII, in pertinent part, makes it "an unlawful employment practice for an employer ... to discriminate against an individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex...." 42 U.S.C. § 2000e–2(a)(1).

*Steele v. Offshore Shipbuilding, Inc.*, 867 F.2d 1311, 1317 (11th Cir.1989) (citations omitted); *see also Hill v. Winn–Dixie Stores, Inc.*, 934 F.2d 1518, 1527 (11th Cir.1991); *Wardwell v. School Bd. of Palm Beach County*, 786 F.2d 1554, 1557 (11th Cir.1986).

 As we have noted, Ford supervised Morgan on two separate occasions. During his first stint as supervisor, in 1984, Ford repeatedly, albeit indirectly, invited Morgan out. Moreover, Ford's inquiries continued even after Morgan had stated that she was not interested in forming a personal relationship with him. Once rebuffed, Ford proceeded to direct completely inappropriate and suggestive remarks at Morgan. In the guise of supervising her work, Ford hovered about her for hours at a time. In this way, he was able to subject Morgan to his unwanted personal attentions. In 1985, Ford rotated to another shift and was no longer Morgan's direct supervisor. Ford and Morgan had much less contact with each other, and most of Ford's inappropriate behavior stopped.

During the second period of supervision, Ford's undesired attentions and reports of masculine virility resumed. Ford's pervasive attention disturbed Morgan, and she complained to Superintendent Burden. After concluding that her charges had not been substantiated, Burden warned Ford to be careful. Ford, having been reprimanded for misconduct before, apparently took the admonition to heart. Ford thus turned from lavishing unwelcome personal attention on Morgan to other methods of making her life miserable. When Ford's supervision of Morgan ceased again, in late 1987, the harassment did not stop. Ford had his co-workers send Morgan messages telling her how he missed her and advising her to drop her charges because "no one would believe her." Additionally, Morgan faced the real possibility that at some point Ford would once again become her immediate supervisor. To preclude this from happening, Morgan resigned her position.

We conclude that a material question of fact remains as to whether Morgan's employment conditions were "intolerable." Accordingly, the district court erred in granting the Department's motions for summary judgment on Morgan's claims for reinstatement with back pay and fringe benefits.

## III.

We affirm the district court's grant of summary judgment for Ford, Meadows and Burden. We vacate the grant of summary judgment for the Department, and remand the case for further proceedings not inconsistent herewith.

IT IS SO ORDERED.