Cecil R. THOMAS, et al., Plaintiffs,

v.

John McKEE, et al., Defendants,

Johnny George, Cross-claim Plaintiff,

v.

John McKee, et al., Cross-claim Defendants.

No. CIV.A. 00–D–572–N.

United States District Court,
M.D. Alabama,
Northern Division.

Feb. 11, 2002.

Julian L. McPhillips, Jr., Kenneth Jay Shinbaum, Joseph C. Guillot, McPhillips, Shinbaum & Gill, Montgomery, for Cecil R. Thomas, Lieutenant, member of the Montgomery Fire Department, Lee McBryde, Lieutenant, member of the Montgomery Fire Department, plaintiffs.

Roger S. Morrow, Wesley Romine, Morrow, Romine & Pearson, P.C., Robert Charles Ward, Jr., Rushton, Stakely, Johnston & Garrett, P.A., A. Wesley Pitters, A. Wesley Pitters, P. C., Misha Y. Mullins, Mark Kennedy, Patrick Patronas, Gathings, Kennedy & Associates, Montgomery, for John McKee, Fire Chief of the Montgomery Fire Department, J.R. Amsler, Fire Marshal of the Montgomery Fire Department, William Davis, District Chief, Montgomery Fire Department, Johnny George, Major, employee of the Montgomery Fire Department, Richard Spruce, Major, employee of the Montgomery Fire Department, the City of Montgomery, a municipal corporation, defendants.

### MEMORANDUM OPINION AND ORDER

DE MENT, District Judge.

Before the court are two Motions For Summary Judgment and six Motions To Strike the affidavits offered in opposition to said Motions. (Doc. Nos.61, 70, 82–83, 89–92.) The first Motion For Summary Judgment was filed on November 7, 2001, by Defendants John McKee, J.R. Amsler, William Davis, and Richard Spruce ("McKee", "Amsler", "Davis", "Spruce", and, collectively, "individual Defendants"); the second was filed by Defendant the City of Montgomery ("the City") on November 19. Each Motion addresses the claims of

Plaintiffs Cecil R. Thomas and Lee McBryde ("Thomas", "McBryde", and, collectively, "Plaintiffs") as well as the cross-claims of Defendant Johnny George ("George"). (Doc. Nos.62–63, 72–74.) While Plaintiffs filed a Response to each respective Motion (Doc. Nos.80, 87), George addressed each Motion in a single Response Brief. (Doc. No. 98.) In turn, the individual Defendants filed a Reply as to each Response (Doc. Nos.86, 88), and the City filed a Reply only as to Plaintiffs' Response brief.[1] (Doc. No. 93.) Accompanying said Reply briefs were six overlapping Motions to Strike the evidentiary submissions relied upon in the various Responses, which were countered by a single page Response. (Doc. Nos.82–83, 89–92, 101.) After careful consideration of the arguments of counsel, the relevant law, and the record as a whole, the court finds that Defendants' Motions To Strike are due to be denied in part and granted in part. Moreover, the court finds that Defendants' Motions For Summary Judgment are due to be granted in part and denied in part.

## I. JURISDICTION AND VENUE

The court exercises subject matter jurisdiction over these claims pursuant to 28 U.S.C. §§ 1343(a)(3) and 1367. The parties do not contest personal jurisdiction or venue.

## II. SUMMARY JUDGMENT STANDARD

When a party moves for summary judgment, the court construes the evidence and makes factual inferences in the light most favorable to the nonmoving party. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Summary judgment is entered only if it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). At this juncture, the court does not "weigh the evidence and determine the truth of the matter," but solely "determine[s] whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (citations omitted).

This determination involves applying substantive law to the pertinent facts that have been developed. A dispute about a material fact is genuine if a reasonable jury could return a verdict for the nonmoving party, based on the applicable law in relation to the evidence presented. *Id.* at 248, 106 S.Ct. 2505; *Barfield v. Brierton,* 883 F.2d 923, 933 (11th Cir.1989). The moving party bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. If this task is satisfied, the burden then shifts to the non-moving party, which must designate specific facts remaining for trial and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). An action will be dismissed when the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party. *Id.* at 587, 106 S.Ct. 1348.

## III. FACTUAL BACKGROUND

The present cause of action centers around the alleged impropriety accompanying the unsuccessful re-election campaign of Emory Folmar, the former Mayor

---

1. Said Reply brief also included a Motion For Oral Argument with respect to the present Motions for Summary Judgment. (Doc. No. 93.) Obviously, this Motion is due to be denied as moot.

of Montgomery. (Compl.¶¶ 11–23.) Plaintiffs, two Lieutenants with extensive tenure in the Montgomery Fire Department ("MFD"), contend that standing within the MFD was directly conditioned on an employee's loyalty to the prior Folmar administration. (*Id.* at 3–4, 11–23.) Specifically, they claim that their reluctance to contribute to Mayor Folmar's re-election efforts was a proximate cause in the denial of their otherwise deserved promotions. (*Id.* at 16, 22.) Accordingly, they brought the present lawsuit against the City, George,[2] and the individual Defendants, ranking officials within the MFD.[3] In the action, Plaintiffs bring state law claims, as well as claims pursuant to 42 U.S.C. § 1983 alleging retaliation in violation of their First Amendment rights.[4] (*Id.* at 24–27, 39–45, 50–55.) George, Plaintiffs' immediate supervisor, filed a cross-claim against McKee, Amsler, Davis, and the City, alleging that he himself was the subject of retaliation, and seeking indemnification to the extent he is found liable on Plaintiffs' state law claims.[5] (Doc. No. 44.)

The only evidence under submission is in affidavit form, and, in light of the numerous Motions To Strike many of these affidavits, the court deems it necessary to address such Motions contemporaneously with the factual discussion.[6] Not counting the overlapping Motions To Strike, Defendants have raised more than fifty objections which have varying degrees of merit. It is worth noting, however, that many of the objections, while meritorious, pertain to matters which either are not material to the present case or are admissible through other forms.[7] For purposes of the present

---

2. George did not join in the individual Defendants' Motion For Summary Judgment. Nor did he file a Motion of his own prior to the deadline for dispositive motions as established in the court's Uniform Scheduling Order. (Doc. No. 48.)

3. The hierarchical structure within the MFD is amply demonstrated in an Exhibit to which none of the parties has raised an objection; to the contrary, each party relies upon it to demonstrate the structure. (Resp.Ex. 4.) McKee is the Fire Chief, serving directly under the Mayor's control. (*Id.*) In turn, McKee exercises direct authority over Davis, the Arson Unit Chief, and Amsler, the Fire Marshal. (*Id.*) Under Amsler's immediate command are Spruce, the Major heading the New Construction Division, and George, the Major in charge of the Old Construction Division. (*Id.*) At all times relevant to the present action, Plaintiffs were Lieutenants in the Old Construction Division, answering directly to George.

4. The complaint included other causes of action which have since been dismissed by the court. (Doc. Nos.30, 33.) Moreover, all claims are brought against the individual defendants in their individual capacities only. (*Id.*)

5. The court finds that George's cross-claims against the individual Defendants in their official capacities are due to be dismissed insofar as a cross-claim is also brought against the City. *See Busby v. City of Orlando,* 931 F.2d 764, 776 (11th Cir.1991) (holding that suits against city employees in their official capacity are redundant when the city is also a party).

6. Initially, the court observes that, although there are six Motions to Strike, there is great overlap between a number of them. Indeed, some of the Motions merely incorporate the language of another verbatim and apply them to a different party or a different Motion as the case may be. For example, the City of Montgomery's Motions (Doc. Nos.91, 92) simply adopt en toto the arguments raised in the individual Defendants' Motions. (Doc. Nos.82–83, 89–90.) Moreover, two of the individual Defendants' Motions are identical but for their applicability to different Motions. (Doc. Nos.89–90.) Because the court is addressing all Motions For Summary Judgment and Motions To Strike in the same Order, its findings as to the Motions To Strike numbered 82, 83, and 89 will equally apply to the remaining Motions To Strike.

7. For example, both Plaintiffs state in their affidavits that they "believe that Major Spruce and Major George violated" the MFD internal regulation lying at the heart of their state law

Motions For Summary Judgment, rather than needlessly expend judicial resources, "the court will implicitly address any meritorious objection as needed in its consideration of th[ese] motion[s]" simply by not considering the testimony in question. *Owens v. Superfos*, 170 F.Supp.2d 1188, 1190 n. 1 (M.D.Ala.2001) (internal quotations omitted). On the other hand, when the court relies upon certain evidence to which objections have been raised, it will indicate the reasons for overruling the objections. In short, the six Motions To Strike are due to be granted in part and denied in part.

In early September of 1999, Spruce asked McBryde and Thomas on successive weeks whether they would volunteer to help Mayor Folmar's re-election campaign over the coming weekends. (Thomas Aff. ¶¶ 3–4; McBryde Aff. ¶¶ 3–4.) The nature of such work would be to post signs supporting Folmar in various locations throughout the city of Montgomery. (*Id.*; George Interog. Resp. ¶ 8.) Each Plaintiff refused the invitation to volunteer. (Thomas Aff. ¶¶ 3–4; McBryde Aff. ¶¶ 3–4.) Shortly thereafter, George, Plaintiffs' direct supervisor, called Plaintiffs into his office and remarked that "there will be . . . promotions in the future, and the administration is looking at your loyalty." (Thomas Aff. ¶ 5; McBryde Aff. ¶ 5.) Notwithstanding this conversation, Thomas was steadfast in his refusal to volunteer, citing religious objections; McBryde, however, decided that his career interests outweighed his decided preference for Folmar's challenger, and reluctantly agreed to post signs on subsequent weekend outings. (*Id.*)

In the following weeks, as the campaign efforts intensified, George commented on Thomas' purported disloyalty in the presence of other firemen, rhetorically musing "what do you think about a man who won't vote?" (*Id.* at 6.) Indeed, on one occasion, as the firemen were discussing the campaign during work hours, George told Thomas to leave the room because the discussion was relevant only to "those who said they were going to campaign for Mayor Folmar." (*Id.*) Thomas felt that he unduly was ridiculed and ostracized, so he notified Amsler, George's immediate superior, that he had chosen not to assist in the campaign only because of his religious objections. (Thomas Aff. ¶ 7.)

Shortly thereafter, on October 1 to be precise, Lieutenant K.C. Olivers ("Olivers") was promoted to Captain within the Old Construction Division of the MFD. (McKee Interog. Resp. ¶ 8.) Olivers was present on the very first of the four occasions that George posted campaign signs. (George Interog. Resp. ¶ 8.) The individual Defendants are quick to point out that Olivers was promoted by Mayor Folmar, the only individual with the authority to so act. (McKee Aff. at 3; Amsler Aff. at 2; Spruce Aff. at 2–3.) However, McKee, Spruce and Amsler also admit that they recommended Olivers for promotion, though they aver that the basis for the recommendation was that he was "more qualified" than Plaintiffs. (McKee Interog. Resp. ¶ 9; Amsler Aff. at 3; Spruce Aff. at 2–3.) They also contend that George made the recommendation along with them. (Amsler Aff. at 3; Spruce Aff. at 2–3.) George insists, however, that the recommendation was made only because

claims. (Thomas Aff. ¶¶ 9–10; McBryde Aff. ¶¶ 8–9.) Such beliefs were made abundantly clear in the Complaint; restatement of such legal conclusions does not raise an issue of material fact. Similarly, George's statutory

notice of claim is relevant to prove that, in fact, he notified the other Defendants that he was seeking indemnification, but the allegations stated therein simply are not "facts" for purposes of Rule 56(c).

Amsler so advised him to act, indicating that Olivers' promotion was a foregone conclusion.[8] (George Aff. ¶ 4.)

■ Several weeks after Olivers' promotion, George asked firemen to donate money to a fund so that a billboard reading "Montgomery Firefighters for Folmar" could be erected.[9] (George Interog. Resp. ¶ 9; Thomas Aff. ¶ 8; McBryde Aff. ¶ 7; Free Aff. ¶ 3; Duke Aff. ¶ 3; McKee Aff. ¶ 1.) George contends that he sought such donations on work hours only because Davis "asked" him to do so; indeed, he contends that he refused initially and only made such requests several days later after Amsler "told [him] to do as [he] was asked." (George Interog. Resp. ¶ 9.) Similarly, George states that the only reason he ever asked any firemen to post signs in support of Mayor Folmar is because Amsler and McKee ordered him to seek volunteers in that regard. (George Aff. ¶ 3.) Apparently Amsler told George that some individuals associated with the Folmar campaign had specifically requested such assistance from McKee.[10] (Id.) Notably, George has stated that one of these individuals, Randy Dixon, was present on one occasion when signs were being posted, and he was recording the names of the participating volunteers. (George Interog. Resp. ¶ 8.)

The individual Defendants deny that they ordered George to ask McBryde and Thomas to participate in Folmar's campaign. (McKee Aff. at 2; Amsler Aff. at 2; Davis Aff. at 2; Spruce Aff. at 2.) Rather, they insist that any participation in the campaign on the part of MFD employees was done on a purely voluntary basis. (Id.) All but Davis openly acknowledge participation in the campaign to varying degrees, and the evidence indicates that even Davis contributed money to the campaign. (Id.; Resp. Ex. 19.) Davis further attempts to distance himself from George and Plaintiffs by pointing out that, as Chief Arson Investigator, he does not lie in their chain of command. (Davis Aff. at 1.) Spruce makes the same argument, notwithstanding his admission of having recommended Olivers for promotion. (Spruce Aff. at 1, 3.)

■ Shortly after the election, Plaintiffs filed a notice of claim upon Defendants, and George subsequently served his own notice of claim seeking indemnification. (George Aff ¶ 7.) George contends that the

---

**8.** Defendants object to this portion of George's affidavit on the grounds that George implies that Amsler possessed promotion authority whereas only Folmar could so act. (Doc. 83 at 3.) Accordingly, they argue, the statement is made outside George's "personal knowledge" and "is improper opinion evidence." (Id.) The court does not draw such an inference. Rather, the court finds that George's affidavit merely suggests that, of the three individuals who made the recommendation that Olivers be promoted, Amsler played a more significant role. Therefore, this portion of the Motions To Strike is due to be denied.

**9.** Although Defendants object to these portions of the McBryde and Thomas affidavits, the grounds for so objecting are that Plaintiffs speculate that George made the request at the behest of superior officers. (Doc. No. 82 at

1.) The court agrees that the affidavits provide no indication that Plaintiffs had a basis for knowing why George made the request and the Motions To Strike are granted in this regard. However, the court relies on these affidavits to the extent that they indicate that George made the request in late October.

**10.** Although numerous meritorious objections are made to the third paragraph of the George Affidavit, the court notes that none were made as to the previous two statements. (Doc. No. 83 at 2.) Accordingly, they may be relied upon for present purposes. *See Givhan v. Elec. Eng'rs, Inc.*, 4 F.Supp.2d 1331, 1334 n. 2 (M.D.Ala.1998) ("Even if an affidavit contains some inadmissible material, the court is not required to strike the entire affidavit. The court may strike *or disregard* the inadmissible portions and consider the rest of the affidavit.") (emphasis added).

individual Defendants reacted negatively to his having served such notice, especially after the *Montgomery Advertiser* ran a front page story as to his claim.[11] (*Id.*) Without providing any specific examples, George states that Spruce began taking disciplinary action against employees who were under George's supervision. (*Id.*) When he complained, George was told that Amsler had given Spruce the authority to so act. (*Id.*) In March of 2000, two of George's subordinates were formally reassigned to the detriment of his division's efficacy; George's suggestions that race might be an factor in the incident were met with Amsler response that such complaints were "nothing but more of [his] bullshit." (*Id.*) In July, four of George's inspectors were sent to a training course in Tuscaloosa, but George was not notified until "virtually the last minute." (*Id.* at 8.) Also, a number of meetings were held pertaining to matters George believed to be in his ambit, yet he was not invited to attend. (*Id.* at 8–9.) McKee and Amsler do not deny that the above has taken place, but they stand by their actions, insisting they were done only with the best interests of the MFD in mind. (McKee Aff. at 4; Amsler Aff. at 3–4.) Davis, on the other hand, asserts that he is not in a position of authority in relation to George such that he could have had any involvement in the above actions. (Davis Aff. at 2–3.)

## IV. DISCUSSION

### A. *First Amendment Retaliation Claims*

 It is well settled that, "unless the government has a vital interest in doing so," it may not condition public employment on a basis that infringes the employee's right to free association as protected by the First Amendment. *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 78, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990). Similarly, the First Amendment protects government employees from adverse employment actions that infringe upon their "constitutional right to freedom of expression." *Rankin v. McPherson*, 483 U.S. 378, 383–84, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987). A corollary of these propositions is that the government may not alter its employees' work conditions "in retaliation for" their having exercised their First Amendment rights. *Morgan v. Ford*, 6 F.3d 750, 753–54 (11th Cir.1993). Plaintiffs assert that Defendants infringed upon their right to free association by conditioning promotion within the MFD upon support for Mayor Folmar. (Compl.¶¶ 24–27.) George, on the other hand, asserts a right to petition claim, claiming that his responsibilities were diminished after he filed his indemnification claim. (Am.Cross-cl. ¶¶ 17–22.) Because the analyses employed by the court differs with each claim, the court will discuss each First Amendment claim in turn.

### 1. *Plaintiffs' Freedom of Association Claims*

 Just as the First Amendment prohibits the state from denying its citizens the right to associate with whomever they choose, so too it prevents the state from compelling any such association. *See Rutan*, 497 U.S. at 71, 110 S.Ct. 2729. As such, the state may not tie employment

---

11. Defendants object to the admission of said newspaper article in evidence on the grounds of hearsay. (Doc. No. 89.) The court recognizes the general rule that such evidence is hearsay, *see Dowdell v. Chapman*, 930 F.Supp. 533, 541 (M.D.Ala.1996), and emphasizes that it relies upon the article only to the extent that the hard copy proves such an article was actually written. In other words, it is not being used "to prove the truth of the matter[s] asserted" therein, so it is not hearsay when used for such limited purposes. *See Cargill v. Turpin*, 120 F.3d 1366, 1374 n. 15 (11th Cir. 1997) (providing a definition of hearsay).

benefits to political party membership given "the coercion of belief that necessarily flows from the knowledge that one must have a sponsor in the dominant party in order to retain one's job." *Branti v. Finkel*, 445 U.S. 507, 516, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980). Among the terms and conditions of public employment that invoke First Amendment scrutiny are "promotions, transfers, and recalls after layoffs based on political affiliation or support." *Rutan*, 497 U.S. at 75, 110 S.Ct. 2729. It is pursuant to this general proscription that Plaintiffs seek legal and equitable relief.

■ The Eleventh Circuit does not require Plaintiffs to demonstrate that their claimed freedom of association pertains to matters of public concern. *Hatcher v. Bd. of Pub. Educ. & Orphanage for Bibb County*, 809 F.2d 1546, 1558 (11th Cir. 1987). Therefore, in analyzing whether a government employee's freedom of association rights have been infringed involves a three-part test. *Green v. City of Montgomery*, 792 F.Supp. 1238, 1252 (M.D.Ala. 1992). The first step is for the court to balance an employer's interest in maintaining an efficient workplace against the weight accorded to the employee's First Amendment rights. *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). If the First Amendment interest is of sufficient importance, Plaintiffs then have the burden of showing that the protected activity "was a substantial motivating factor in the" decision not to promote them. *Morgan v. Ford*, 6 F.3d 750, 754 (11th Cir.1993) (internal quotations omitted). If Plaintiffs demonstrate this, the burden shifts to Defendants to prove by a preponderance of the evidence that they would not have promoted Plaintiffs, regardless of the parties' divergent political inclinations. Neither party addresses the *Pickering* balancing test, presumably because it is clear that Plaintiffs' right to choose not to volunteer in a mayo-

rial campaign poses no threat to their ability to extinguish fires. Accordingly, the following discussion will focus on the role Plaintiffs' choices played in their denial of a promotion.

The Eleventh Circuit has observed that "[i]t is neither possible nor desirable to fashion a single standard for determining when an employee has met her initial burden of demonstrating that retaliatory intent was a substantial or motivating factor" behind an adverse employment action. *Beckwith v. City of Daytona Beach Shores*, 58 F.3d 1554, 1564–65 (11th Cir.1995). Nonetheless, upon analyzing Supreme Court precedent, the *Beckwith* court synthesized the general conclusion that "purely circumstantial evidence, taken in the light most favorable to the plaintiff, can create a jury question on the issue." *Id.* The court finds that the circumstantial evidence in the present matter raises questions as to the motivations driving MFD promotion decisions.

■ For instance, on two separate occasions an MFD officer asked Plaintiffs to assist in Folmar's re-election campaign. Upon refusing to do so, Plaintiffs were called into a meeting by their immediate supervisor and were informed of the possibility of upcoming promotions. In this meeting, it was suggested that loyalty to the administration would be a factor in said promotions. Two weeks after the meeting, Olivers, an individual who had worked on the campaign, was promoted, but Plaintiffs were never given a promotion. Thomas had not worked on the campaign and was ostracized within the MFD because of it. McBryde had worked on the campaign after he felt bullied into it, but by this time, Olivers had already put in face time in the presence of a number of the individual Defendants as well as high-ranking officials within Mayor Folmar's office. (George Interog. Resp. ¶ 8.) Defendants respond with blanket state-

ments that seniority does not factor into employment decisions within the MFD and that Olivers was more qualified than Plaintiffs. However, no more detail is provided as to said qualification disparities. These facts together are more than adequate to raise a jury question as to whether or not Plaintiffs were denied a promotion due to their having exercised their First Amendment rights.

As to the third factor in the analysis, it is to be noted that, since the evidence at this stage is to be construed in the light most favorable to the non-movants, the preponderance of the evidence is a nearly impossible standard for summary judgment movants to satisfy. Indeed, the *Beckwith* court held that once evidence has been offered suggesting that a plaintiff's First Amendment activity was a substantial motivating factor in the employment decision, a defendant's proffered justifications are a question for the jury. *Beckwith*, 58 F.3d at 1564. The Eleventh Circuit has limited *Beckwith* to the facts of its case, however, recognizing that it involved the appeal of a final judgment on the merits where no qualified immunity issues were present. *Stanley v. City of Dalton*, 219 F.3d 1280, 1292 n. 21 (11th Cir.2000) ("In contrast, those cases involving a qualified immunity defense all appear to conduct an inquiry of the fourth prong on the merits prior to reaching the qualified immunity question."). Because Defendants have raised such defenses in the present matter, a conclusion on the summary judgment motions is not yet warranted. Indeed, the potential scope of liability as to each respective Defendant merits discussion given each individual Defendant's attempts to distance himself from Plaintiffs' situation.

### a. The scope of the individual Defendants' liability

The crux of the individual Defendants' arguments is threefold. First, they all blanketly deny ever having told George to coerce Plaintiffs into helping with the Folmar campaign; indeed, they insist that any role they might have played concerning the interrelationship between the Folmar campaign and the MFD was consistent with the City's policy that firefighters assist only on a volunteer basis during off-work hours. Second, the individual Defendants adamantly contend that only Mayor Folmar made the promotion decision lying at the heart of the present action; therefore, they argue, the mere recommendation for promotion should not be sufficient to invoke liability under Section 1983. Finally, the individual Defendants assert that even if the court were to disagree with the above conclusions, qualified immunity should shield them from liability in their individual capacities. The court will address each contention in turn.

### i. Who is responsible?

The parties have presented a chart detailing the structured hierarchy within the MFD. *See supra* note 3. The multiple tiers existing within the chain of command are consistent with the Eleventh Circuit's portrayal of a fire department as "a paramilitary organization." *Anderson v. Burke County*, 239 F.3d 1216, 1222 (11th Cir. 2001). As with the present matter, the *Anderson* case concerned First Amendment retaliation in the context of a fire department. *Id.* at 1218–19. The *Anderson* court held that, as a paramilitary organization, the defendant fire department had an especially acute interest in sustaining efficiency by limiting internal dissent. *Id.* at 1221–22. More specifically, an individual's free speech interests weighed less heavily than the fire department's "need to secure discipline, mutual respect, trust and particular efficiency among the ranks due to its status as a quasi-military entity different from other

public employers." *Id.* at 1222 (internal citations omitted).

 The general recognition as to fire departments' strict regimes offers a context by which the relevant facts can be understood. For example, while George suggested to Plaintiffs that there would be a link between promotions and administrative loyalty, he insists that he was speaking at the directive of Amsler and McKee, the immediate two levels overseeing George in the chain of command. While the individual Defendants assert that they never ordered George to pose the ultimatum specifically to Plaintiffs, they do not deny having ordered him to do so generally. They similarly deny possessing the authority to make promotions, but so too does George lack such authority, yet there must be an explanation as to why he was making the conditional offer thereof. The explanation most consistent with the evidence before the court is that the offer was filtered down through the chain of command. The "mutual respect, trust and particular efficiency" lying at the heart of the MFD organizational structure give rise to an inference that an underling's actions embody the requests of a superior, if not the policy of the MFD generally. At the very least, Plaintiffs have raised a genuine issue of material fact in this regard.[12]

 While the above discussion readily applies to McKee, Amsler, and George, direct links between Plaintiffs and Mayor Folmar, more discussion is needed as to Spruce and Davis who point out that they are not in the direct chain of command. The only evidence before the court implicating Davis in the matter is that he asked George to solicit money for the billboard and that he donated money himself.

There is no indication that he was involved in the posting of the signs, let alone that he had any input as to promotion decisions within Amsler's division of the MFD. No juror could reasonably infer from this evidence alone that Davis' involvement in the Folmar campaign in any way relates to the failure to promote Plaintiffs. Accordingly, Davis' Motion For Summary Judgment is due to be granted.

 Spruce likewise did not lie in Plaintiffs' direct chain of command. He did bear more immediate ties to Plaintiffs than did Davis, given that they all are under Amsler's authority. (Resp.Ex. 4.) The evidence also shows that Spruce directly asked Plaintiffs to help put up signs on two occasions. Just five days after their second refusal, George met with them and told them that the administration would link promotions with campaign efforts. (Thomas Aff. ¶¶ 4–5; McBryde Aff. ¶¶ 4–5.) An inference can be drawn from this connection that Spruce felt that Plaintiffs' refusal to do "voluntary" work was significant enough that he would notify the appropriate official. Therefore, that Spruce was not in Plaintiffs' direct chain of command does not rule out that he could have been involved in the infringement of their freedom of association. To the contrary, the fact that he admits to having recommended Olivers for promotion indicates some involvement therein. This conclusion is strengthened in light of the evidence that, on the first sign-posting excursion, Spruce and Olivers worked side-by-side, while Plaintiffs had refused Spruce's invitation. The court believes the above circumstantial evidence is sufficient for a reasonable jury to conclude

---

**12.** In addition to what has already been discussed, George has stated that the similar chain of command was instrumental in the solicitation of donations from the MFD staff. Add to this the fact that each individual De-

fendant was involved to varying degrees in the Folmar campaign, and credence is lent to George's contention that his exchange with Plaintiffs was but one link in a department-wide effort to re-elect Folmar.

that Spruce was involved in the violation of Plaintiffs' rights.

The foregoing discussion would be rendered moot, however, if the court were to give significance to the fact that only Mayor Folmar possessed formal promotion authority. McKee, Amsler, George, and Spruce all acknowledge having recommended Olivers for promotion rather than Plaintiffs. For purposes of First Amendment retaliation, the court observes that even the most minuscule of adverse employment actions give rise to a cause of action if they followed protected activity. *Rutan,* 497 U.S. at 76 n. 8, 110 S.Ct. 2729 (recognizing that the First Amendment protects against "even an act of retaliation as trivial as failing to hold a birthday party for a public employee ... when intended to punish her for exercising her free speech rights.") (internal quotations omitted). Recommendation for promotion, however, is not minuscule, especially when no evidence is offered that any other employee was given such a recommendation. In such circumstances, the court sees little reason to draw any distinction whatsoever between the recommendation and the actual promotion; if anything more weight should be given to the recommendation. *Cf. Gattis v. Brice,* 136 F.3d 724, 727 (11th Cir.1998) (holding that fire department administrator could not be held liable for retaliation absent evidence that he "not only accepted the recommendation of his deputy chiefs, but knew of and ratified the improper motives behind the recommendations").

Defendants protest that there is no evidence suggesting that Folmar merely rubber-stamped the recommendation. The court disagrees with Defendants' characterization of the evidence. A jury could infer from the fact that but one recommendation was made that Folmar was not involved in the decision. However, a jury could also conclude that the Mayor asked

for but one recommendation, namely of an MFD employee who had demonstrated his loyalty. Either conclusion is sufficient to implicate the liability of the individual Defendants to the extent that they made a recommendation based purely upon campaign involvement. In short, the facts before the court raise a genuine issue of material fact as to whether Amsler, McKee, Spruce, and George infringed upon Plaintiffs' First Amendment rights, so summary judgment would be improper at this point.

### ii. Qualified immunity

The individual Defendants contend, however, that they are entitled to qualified immunity. The doctrine of qualified immunity is rooted in the notion that it would be unjust to impose monetary damages on public officials who might erroneously believe they simply were doing what their job required. This unfairness can be remedied by limiting the imposition of damages to those circumstances in which the layperson would not be required to predict whether or not the law permits certain actions; in other words, damages actions are permitted only when public officials violate "clearly established law." *Rogers v. Miller,* 57 F.3d 986, 988 (11th Cir.1995). The Eleventh Circuit has held that, given the highly fact-intensive nature of First Amendment cases, defendants in such cases "rarely act within clearly established contours of law." *Hansen v. Soldenwagner,* 19 F.3d 573, 575 (11th Cir. 1994).

The exception to this general rule, however, is in the so-called "extraordinary case" in which the *Pickering* balance inevitably would favor the plaintiff. *Id.* at 578. Not only does the *Pickering* balance favor Plaintiffs in the present case, it does so to such a degree that Defendants did not even contest it, *see supra* at 1284. It is clearly established law that

"promotions ... based on political affiliation or support are an impermissible infringement on the First Amendment rights of public employees." *Rutan,* 497 U.S. at 75, 110 S.Ct. 2729. This clear rule was established by the Supreme Court twelve years ago and its implications in the present matter are readily apparent. Accordingly, the individual Defendants cannot hide under the Eleventh Circuit's broad qualified immunity rule in this respect.[13] As such the Motions For Summary Judgment of all the individual Defendants save Davis are due to be denied.

### b. Municipal Liability

 The City may not be held liable for the individual Defendants' actions on the theory of respondeat superior; rather, liability will lie only if said actions "result from an official government policy," if the individual Defendants may be "fairly deemed to represent government policy," or if the actions are emblematic of "a custom or practice so pervasive and well-settled that it assumes the force of law." *Oladeinde v. City of Birmingham,* 230 F.3d 1275, 1295 (11th Cir.2000) (internal quotations omitted). "To establish a policy or custom, it is generally necessary to show a persistent and wide-spread practice. Moreover, actual or constructive knowledge of such customs must be attributed to the governing body of the municipality." *Wayne v. Jarvis,* 197 F.3d 1098, 1105 (11th Cir.1999) (quoting *Depew v. City of St. Mary's,* 787 F.2d 1496, 1499 (11th Cir.1986)). The same facts that implicate the numerous individual Defendants can be characterized as a widespread practice.

 In the weeks leading up to the election numerous MFD officials solicited campaign assistance from employees during work hours. Meetings were held during work hours pertaining to the campaign, and non-participants were excluded and ridiculed. During the campaign efforts, Mayor Folmar's executive assistants actively sought said assistance. These very individuals then appeared at the off-work outings and kept a record of which employees assisted in the campaign efforts. George plainly stated that the administration was looking at loyalty in making its promotion decisions. The individual Defendants recommended to Mayor Folmar that an employee who willingly volunteered in the campaign be promoted. These facts are more than sufficient to raise a jury question as to a pervasive and wide-spread practice.

Admittedly there is no direct evidence suggesting that the final decisionmaker, Mayor Folmar, was aware of said practice, but the present matter can be readily distinguished from, say, a police brutality case where there is no clear basis upon which to presume such notice. *See, e.g., Brooks v. Scheib,* 813 F.2d 1191, 1193 (11th Cir.1987) ("Quite simply, there is no evidence that city officials were aware of past police misconduct."). Here, the constitutional violation centers on the city official's

---

13. Although they do not so argue, it might be suggested that there was no clearly established law holding that mere recommendations for promotion can be considered a constitutional violation. Although qualified immunity does not require public officials to possess a logician's inferential ability, neither does it require absolutely identical factual scenarios before liability may be imposed. Rather, the applicable standard is "whether *a reasonable person* in the position of the defendant would know that he was violating clearly established law." *Hansen,* 19 F.3d at 578 (emphasis in original). The facts of the present case indicate that there is little, if any, functional difference between the recommendation for a promotion and the subsequent promotion in the MFD chain of command. In light of these facts, the court concludes that reasonable people in Defendants' position would have known they were violating clearly established law.

own election campaign. The evidence before the court has amply demonstrated that the MFD officials who were directly under his chain of command were his ardent supporters. His executive assistants sought the help of these individuals. The pervasive support for the Folmar campaign within the MFD could not have arisen in a vacuum. The court is persuaded that a reasonable jury could view all the facts and conclude that, at the very least, Mayor Folmar was aware of the practices within the MFD. As such, there is a genuine issue of material fact on the issue of the City's liability in the present action, so its Motion For Summary Judgment as to Plaintiffs' claims is due to be denied.

### 2. George's Right to Petition Cross-claims

■ "The right to petition is cut from the same cloth as the other guarantees of [the First] Amendment, and is an assurance of a particular freedom of expression." *McDonald v. Smith,* 472 U.S. 479, 482, 105 S.Ct. 2787, 86 L.Ed.2d 384 (1985). Accordingly, the court applies the same test to George's claim as if it were a free expression claim. *See Stalter v. City of Montgomery,* 796 F.Supp. 489, 494 (M.D.Ala.1992). This test is the same test as applied to Plaintiffs' freedom of association claim, but for the addition of one more factor. *See Morgan,* 6 F.3d at 754. Namely, George must show that his indemnification claim can be "fairly characterized as constituting speech on a matter of public concern." *Id.* (internal quotations omitted). If he satisfies this initial burden, the court is to weigh his First Amendment interests against Defendants' interest in "promoting the efficiency of the public services it performs through its employees." *Id.* (internal quotations omitted). Should the court find George's relative interests to bear sufficient weight, it must examine whether or not his statements played a "substantial part" in the diminishment of his overall responsibilities within the MFD.[14] *Id.* (internal quotations omitted). An affirmative finding in this regard shifts the burden to Defendants to prove by a preponderance of the evidence that the perceived lessening of responsibilities would have occurred notwithstanding the indemnification claim. *Id.*

■ Defendants offer but one argument in support of summary judgment: George's indemnification claim does not constitute speech of sufficient "public concern" so as to deserve First Amendment protection. The Supreme Court has held that "when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of [an allegedly retaliatory] personnel decision." *Connick v. Myers,* 461 U.S. 138, 147, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). The distinction between public and private concern is a ques-

---

**14.** The parties do not contest that the alleged diminishment of George's responsibilities constitute an adverse employment action for purposes of First Amendment retaliation. Indeed, the term " 'adverse employment action' is broadly defined and as a matter of law includes not only discharges, but also demotions, refusals to hire, refusals to promote, and reprimands." *McCabe v. Sharrett,* 12 F.3d 1558, 1563 (11th Cir.1994) (holding that transfer to position involving same pay rate yet less responsibility and more menial tasks was an adverse employment action). The societal interest in encouraging an open forum in which citizens may freely voice their opinions is so cherished that the Supreme Court has recognized that the First Amendment protects against "even an act of retaliation as trivial as failing to hold a birthday party for a public employee ... when intended to punish her for exercising her free speech rights." *Rutan,* 497 U.S. at 76 n. 8, 110 S.Ct. 2729 (internal quotations omitted).

tion of law to be determined by examining "the content, form, and context of a given statement as revealed by the whole record." *Id.* at 147–48, 103 S.Ct. 1684.

Defendants attempt to characterize George's claim as a matter of his own financial interest, and point to a decision of the Eleventh Circuit holding that an *ante litem* claim against the city alleging discrimination was not a matter of private concern. *Holbrook v. City of Alpharetta,* 112 F.3d 1522, 1530 (11th Cir.1997). The *Holbrook* court pointed out, however, that an anti-discrimination grievance could, in certain circumstances, rise to a level of public concern. *Id.* at 1530 n. 6. Indeed, the general public may have a great interest in learning that a particular government employer engages in a pattern of discriminatory conduct. The *Holbrook* court observed that the claim in question did not allege any such wrongdoing on the part of the city defendant, but rather merely pertained to the plaintiff's particular grievance and sought no relief "beyond improving Holbrook's personal employment situation." *Id.* at 1530.

George seeks to distinguish *Holbrook* by characterizing his statutory claim as an announcement to the body politic that the MFD hierarchy is saturated with a most opprobrious corruption. This contention seeks its own precedential support in an Eleventh Circuit case holding that a police officer engaged in protected speech when he reported to the city manager that the police chief had stolen whiskey from the evidence room. *Bryson v. Waycross,* 888 F.2d 1562, 1564 (11th Cir.1989). In addition to citing *Bryson*'s general rule that "whistleblowing" is of public importance, *id.* at 1566, George buttresses his argument by pointing out that the *Montgomery Advertiser* ran a front page story announcing the allegations stated in his claim. In today's sensationalistic, profits-driven media market, "newsworthiness" is not neces-

sarily synonymous with "of public concern," but the court cannot altogether overlook the inference to be drawn from the *Advertiser's* decision to run the story on the front page. Before a hasty conclusion is drawn, however, more discussion is needed as to the "content, form, and context" of George's claim.

The contention that George was in any sense involved in whistleblowing activity is dubious. Claims had already been filed against the City, the individual Defendants and himself, so at best, George was merely drawing the public's attention to his insistence that culpability did not lie with him. Nowhere in his indemnification did he seek injunctive relief against Defendants for their alleged wrongdoing. Cf. *Holbrook,* 112 F.3d at 1530 (observing that private damages sought to remedy one's personal situation weighs against a finding that a claim is of public concern). Rather, he requests $100,000 in damages for the "emotional stress" resulting from media fallout surrounding Plaintiffs' initial claims. (Resp. Ex. 4 ¶¶ 16–17.) Implicit in the very speech he characterizes as whistleblowing is the admission that the whistle had already been blown.

 The court finds that his speech was merely an effort to avert the public's attention away from him and toward the remaining Defendants; he was motivated by self-interest rather than concern for the public interest in information. *Cf. Goffer v. Marbury,* 956 F.2d 1045, 1049 (11th Cir.1992) (observing that employee's motivation in speaking is relevant in determining whether speech is a matter of public concern). George's assertions that he was cimply following orders did not supplement the information already available to the public, namely the alleged close ties between the MFD hierarchy and the Folmar campaign. He did not seek to bring even this information to the public's attention

until he discovered a purported basis for compensation. Based on these facts, the court concludes that George's indemnification claim was not of sufficient public concern to merit First Amendment protection.[15] Accordingly, Defendants' Motions For Summary Judgment are due to be granted on George's retaliation claims.

### B. *State Law Claims*

██ The Criminal Code of Alabama makes it a felony for any person to "attempt to use his or her official capacity or position for the purpose of influencing the vote or political action of any person." Ala.Code § 17–1–7(b) (1975). Plaintiffs do not contend that the court has jurisdiction over criminal matters of the state of Alabama. Rather, they ask the court to exercise supplemental jurisdiction over civil claims brought pursuant to Ala.Code § 6–5–370 (1975). This statute states that for "any injury, either to person or property, amounting to a felony, a civil action may be commenced by the party injured without prosecution of the offender." *Id.* Plaintiffs misconstrue the Civil Code. The Supreme Court of Alabama has explicitly stated that this statute does not create a civil cause of action; rather it was merely intended to abrogate the common law rule of suspension which precluded civil damages claims in these circumstances absent the prosecution of the felonious offender. *Lewis v. Fraunfelder,* 796 So.2d 1067 (Ala. 2000). As such, Plaintiffs have failed to state a claim upon which relief may be granted so their state law claims must fail.

██ Plaintiffs also assert violations of the Rules and Regulations of the Mont-gomery Fire Department as well as the City of Montgomery Personnel Board Rules and Regulations, citing rules which similarly criminalize corrupt political behavior on the part of officials subject thereto. (Compl.¶¶ 50–53.) Plaintiffs have offered no suggestion as to how the court plausibly might have jurisdiction over the City's internal regulations or the MFD's handbook. Indeed, unlike with the state code, Plaintiffs have not even offered any implausible suggestions in this regard. Accordingly, such causes of action are likewise due to be dismissed. There being no more state law claims against Defendants, a fortiori George's indemnification claims are likewise due to be dismissed.

### V. ORDER

Based on the forgoing, it is CONSIDERED and ORDERED as follows:

(1) Defendants' Motions To Strike (Doc. Nos.82–83, 89–92, 101) be and the same are hereby GRANTED in part and DENIED in part;

(2) Defendant William Davis' Motions For Summary Judgment (Doc. Nos.62–63) be and the same is hereby GRANTED and the clerk is DIRECTED to remove his name from the caption of this case;

(3) Defendants' Motions For Summary Judgment as to Plaintiffs' claims (Doc. Nos.63, 72) be and the same are hereby GRANTED in part and DENIED in part;

(4) Defendants' Motions For Summary Judgment as to Defendant Johnny George's Cross-claims (Doc. Nos.62, 73) be and the same are hereby GRANTED; and

---

**15.** The court emphasizes the fact-specific nature of the "public concern" analysis by observing that its decision should not be construed as removing from the realm of protected speech any subsequent pleadings or lawsuits resulting from a case that has already drawn public attention. Often an initial lawsuit serves to merely scratch the surface as to an entities' wrongdoings, and the filing of subsequent lawsuits should not be chilled merely out of an employee's fear of retribution. The court finds only that, in the present scenario, George merely intended to save his reputation and offered little substance to the public dialogue.

(5) Defendant City of Montgomery's Motion For Oral Argument (Doc. No. 93) be and the same is hereby DENIED AS MOOT.